

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

**NO. AP-76,703**

**JAIME PIERO COLE, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL FROM CAUSE NO. 1250754
IN THE 230TH JUDICIAL DISTRICT COURT
HARRIS COUNTY**

JOHNSON, J., delivered the opinion of the unanimous Court.

**O P I N I O N**

In October 2011, a jury convicted appellant of capital murder for the shooting deaths of his

wife and step-daughter during the same criminal transaction. TEX. PENAL CODE ANN. § 19.03(a)(7).

Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure

Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 §

2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises seventeen points

of error. After reviewing appellant's points of error, we find them to be without merit.

---

[1] Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

Consequently, we affirm the trial court's judgment and sentence of death.

## Sufficiency of the Evidence—Future Dangerousness

In point of error ten, appellant challenges the sufficiency of the evidence to support the jury's affirmative answer to the future-dangerousness special issue. Art. 37.071, § 2(b)(1). We shall address this issue first, followed by the remaining points of error in the order presented in the briefs.

The future-dangerousness special issue requires the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, § 2(b)(1). When reviewing the legal sufficiency of the evidence supporting an affirmative answer to the future-dangerousness special issue, we review the evidence in the light most favorable to the verdict. *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Assessing the evidence and all reasonable inferences therefrom in this light, we determine whether any rational trier of fact could have believed beyond a reasonable doubt that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Williams*, 273 S.W.3d at 213; *Alvarado v. State*, 912 S.W.2d 199, 209 (Tex. Crim. App. 1995).

In deciding this special issue, the jury is entitled to consider all of the evidence admitted at both the guilt and punishment phases of trial. *Devoe v. State*, 354 S.W.3d 457, 461 (Tex. Crim. App. 2011). The jury may also consider a variety of factors, including: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting

under duress or the domination of another when he committed the crime; (7) psychiatric evidence; and (8) character evidence. *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). The circumstances of the offense and the events surrounding it may be sufficient in themselves to sustain an affirmative answer to the future-dangerousness special issue. *Devoe*, 354 S.W.3d at 462; *Hayes v. State*, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002). An escalating pattern of violence or disrespect for the law may also support a finding of future dangerousness.[2] A lack of remorse or evidence that a defendant planned to kill again may likewise support a finding of future dangerousness.[3] The future-dangerousness special issue focuses upon the character and internal restraints of the particular individual, rather than the external institutional restraints of incarceration. *Coble v. State*, 330 S.W.3d 253, 268 (Tex. Crim. App. 2010). With these principles in mind, we turn to the evidence placed before the jury at both phases of appellant's capital murder trial.

At the guilt phase, the state presented evidence that appellant committed the instant offense shortly after 8:00 p.m. on February 4, 2010. Appellant and his wife, Melissa Cole, had been experiencing marital strife in the weeks preceding the killings. About a month before the shootings, Melissa moved herself, the couple's two young sons (Piero, age ten, and Lucas, age two) and her daughter from a prior relationship (Alecia "Desirae" Castillo, age fifteen) from the family home into a small apartment.

Following the move, Piero and Lucas continued to have contact with appellant, spending two days a week with him. The boys had been staying with appellant for the two days immediately

---

[2] *Swain v. State*, 181 S.W.3d 359, 370 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

[3] *Smith v. State*, 74 S.W.3d 868, 872 (Tex. Crim. App. 2002); *Rachal v. State*, 917 S.W.2d 799, 806 (Tex. Crim. App. 1996).

preceding the killings. Piero testified that appellant seemed normal during this time and that he did not see appellant consume any alcohol.[4] Shortly before returning the boys to Melissa that evening, appellant took them out to eat. During the meal, appellant drank two beers. Appellant, who had purchased a .22-caliber semi-automatic pistol the previous afternoon, told Piero during the meal that if appellant or Melissa died, Piero should live with appellant's biological sister in Ecuador.[5]

When returning the boys after their visits, appellant usually called Melissa from the apartment complex's parking lot to inform her that the children were back, but he did not enter the apartment. On the evening of the murders, however, appellant parked his truck and went inside with the boys. Desirae and Melissa were in the apartment. Chloe Mahalec, Melissa's nine-year-old niece who often visited the family, was also present.

Appellant and Melissa began arguing in Melissa's bedroom. After Desirae complained about the noise, appellant and Melissa went outside. The children remained inside the apartment. As the adults' argument grew louder, Desirae pounded on the inside of the front door several times, telling appellant and Melissa to be quiet. When Melissa began to scream, "Help me, help me," in fear, Desirae opened the front door, again telling appellant and Melissa to be quiet. Desirae and Chloe saw appellant shooting Melissa, who collapsed in the front doorway. Appellant continued firing at Melissa when she was on the ground.

Chloe ran to the kitchen to hide from appellant. Lucas stayed where he was, sitting on the floor between the hall and entry to the kitchen, crying. Desirae fled to the back bedroom. Piero hid

[4] At trial, appellant argued that alcohol use played a central role in the offense, as well as in his past negative behavior.

[5] The record shows that appellant was born in Ecuador. When he was roughly ten years old, Hazel and Jim Cole adopted him and brought him to the United States.

in the bathroom attached to the same bedroom. From inside the bathroom, Piero heard four or five "clicks" from the bedroom, and from her hiding spot in the kitchen, Chloe twice heard Piero yell, "No." When Piero opened the bathroom door, he saw Desirae lying on the bedroom floor on her side. Appellant was in the bedroom, holding a pistol and retrieving shell casings.[6] Without looking at or speaking to Piero, appellant removed the magazine from the pistol, pocketed it, and ran out of the bedroom, still holding the pistol. Appellant pointed the pistol at Chloe, but it only went "click-click" instead of "boom-boom."

Piero ran for help, but both Melissa and Desirae died at the scene. Two-year-old Lucas, meanwhile, followed appellant to the parking lot. Appellant put Lucas in the front seat of his truck. Without restraining the child, appellant drove through the apartment complex at high speed and rammed his truck through the automatic gate without waiting for it to fully open. Appellant went to his workplace, where he took $1,400 in cash from the safe and looked unsuccessfully for a vehicle to exchange for his truck. Appellant then headed south on U.S. Highway 59, a major corridor between Houston and Mexico.

That same evening, Sgt. Chappell issued an "Amber Alert" for Lucas. Jose Mena, the Texas Department of Public Safety (DPS) trooper who responded to the alert, apprehended appellant at approximately 11:00 p.m. inside a Wharton County Walmart. Appellant, who had Lucas with him inside the store, had just purchased 100 rounds of .22 caliber ammunition, as well as diapers and some food items. Because he had heard that appellant had shot and killed two people, Trooper Mena approached appellant from behind, with his service weapon drawn, as appellant was leaving the

---

[6] Although investigators recovered a total of seven spent shell casings from the crime scene, they did not recover any from the back bedroom where appellant shot Desirae.

store. When Trooper Mena seized appellant and instructed him not to move, a bystander removed Lucas from appellant's shopping cart and took him inside the store. Appellant was arrested without further incident.

In appellant's truck, investigators found a large hunting knife inserted between the driver's seat and center console. Underneath the console, with the magazine inserted, they found appellant's .22 semi-automatic pistol. The magazine was empty, and no bullet was in the chamber. On the passenger-side floorboard, investigators found a loaded shotgun and four bags containing the cash from appellant's employer.

The state's firearm examiner, Joseph Colca, testified that the magazine had a ten-cartridge capacity; with a bullet chambered, plus a full magazine, the weapon's total firing capacity without reloading was eleven rounds.[7] He also told the jury about the multiple safety features that appellant had to override to fire the weapon.

Following his arrest, appellant was taken before a magistrate in Wharton County and informed of his constitutional rights. Before being transported to Harris County, appellant gave a videotaped statement to Houston Police Department (HPD) Sergeants Robert Chappell and William Bush, both of whom testified that appellant's general demeanor while in Wharton County was "angry" and that he did not appear intoxicated. The trial court admitted part of the Wharton County statement as State's Exhibit 8A, which was published to the jury. In that statement, appellant asserted that the shootings were "not planned," but also asserted that the "kids weren't supposed to see." Appellant also stated that, if things had gone right, he would have been dead already because

---

[7] The autopsies revealed that appellant shot Melissa and Desirae eleven times, expending the entire clip plus a chambered round.

he had wanted the police to catch him or shoot him. Appellant said that he would have killed himself, but he had no bullets.

In Harris County, appellant gave a second videotaped statement to HPD Officer Xavier Avila, which was admitted into evidence as State's Exhibit 9 and published to the jury. Appellant stated that he and Melissa were fighting over money and whether the marriage had any chance of continuing. Appellant hoped for a legal separation, but Melissa wanted a divorce. Appellant asserted that Melissa was complaining that she was "broke," although he had been depositing money for her into an account ever since she moved out. Appellant also stated that Melissa was impatient because he had not yet obtained their tax refund, which she wanted to use to pay for a divorce. They argued, and he started crying because Melissa would not agree to a separation rather than a divorce. Desirae came to the door of the bedroom, telling them that they were being too loud, so they went outside.

Appellant said that he had the pistol with him in his waistband and had been carrying it for the last couple of days for protection and because it helped him sleep. When Melissa said that she did not want to again discuss the possibility of a separation, appellant pulled the pistol from his waistband, cocked it, and shot her from a very short distance. Appellant asserted that he did not know how many times he shot Melissa. After Melissa collapsed, appellant stepped over her, went to the back bedroom, and shot Desirae, who had been in the background "screaming at [him]" while he shot Melissa. Appellant asserted that he had not planned any of the violence. Appellant stated that he shot his wife because he was "angry and frustrated about the way everything was going." Regarding Desirae, appellant claimed that he shot her in a moment of anger. When he shot Desirae, appellant was aware that Chloe was in the adjacent kitchen and that Piero was somewhere in the

same bedroom.

The autopsies revealed that Melissa had been shot nine times: once in the head, six times in the chest and abdomen, and twice in her right arm. The shot to her head and a contact-shot to her abdomen were immediately life-threatening. Three of the remaining wounds to her chest and abdomen were potentially fatal. The wounds to her arm were inflicted at very close range and were consistent with pushing the barrel of the gun away. At least six of the bullets traveled in a downward trajectory through her body, consistent with testimony that appellant continued to fire at Melissa after she had fallen to the ground. Desirae sustained two gunshot wounds to the torso, either one of which could have been the cause of death. Both bullets traveled in a downward trajectory, consistent with appellant firing at Desirae from above.

At the punishment phase, the jury heard evidence concerning appellant's interactions with female intimate partners, family members, friends, coworkers, and strangers. It additionally heard evidence regarding appellant's criminal history before and after the instant offense, as well as evidence concerning his prior bad acts and character.

Leticia Leal testified that she and appellant dated off and on through high school and for a few years beyond graduation. Leal recalled that the relationship was good at first, but deteriorated over time. In the spring of 1989, after graduation, appellant and Leal were dating other people but trying to remain friends. Appellant entered the K-Mart store where Leal was working and said hello when he saw her. The encounter was initially friendly, but Leal indicated that she could not continue talking because she was working. Appellant, however, did not leave. Appellant saw that Leal had a hickey on her neck, became upset, and wanted to discuss it. Leal repeated that she could not talk to him then and headed to the store's back warehouse. Appellant followed Leal into the warehouse

area, pushed her against a wall, and grabbed her by the neck. Appellant did not release Leal until her coworker intervened and told appellant to leave. Leal, who had at first been shocked and then frightened by the assault, left work after the incident.

Either the same night or the next day, appellant drove to the home where Leal lived with her parents and sisters. Leal stayed inside while one of her sisters called the police. Another sister, Ann, who was pregnant, went outside. Appellant, who had a handgun, grabbed Ann. Leal's father and brother-in-law tackled appellant, took the weapon away, and told appellant to leave. Leal made a police report, but appellant's mother, Hazel Cole, convinced her not to pursue charges.

Collete Rives testified that she met appellant in 1988 when they were both high school seniors and working at the same place. After a few months, they began dating. Like Leal, Rives testified that the relationship with appellant was initially good. After about five months of dating, she became pregnant by appellant. Rives and appellant were not dating when she subsequently learned of the pregnancy and informed appellant. Appellant told Rives that "he would pay for it but not claim [the child]." Appellant was not present when his daughter, Brittnie, was born in April 1990, did not provide child support until ordered by a court to do so, and did not spend much time with Brittnie, even after appellant and Rives reconciled in April or May 1992. When Rives became pregnant again in June 1992, appellant insisted that Rives terminate the pregnancy.

Appellant and Rives split again, but had reconciled by late July or early August 1993 when Rives learned that she was pregnant by appellant with their son, James. This time, appellant promised to stay with Rives. In September 1993, when Rives's pregnancy was two months along, they spent the evening at the bar run by appellant's mother, Hazel. They then went to Hazel's house, where they were spending the night. Rives and appellant argued. Rives did not take any physical

action against appellant. Appellant, however, who knew Rives was pregnant, suddenly punched her hard in the stomach. The blow hurt, and Rives lay down on the bed and began to cry. Besides being in pain, Rives was very concerned about the unborn baby. After hitting her, appellant lay down on the bed and went to sleep, although he apologized the next day.

Rives stayed in a relationship with appellant until they broke up again a few days before November 24, 1993. At that date, Rives was about four-and-a-half months along and visibly pregnant. Carl Freeman was appellant's longtime friend and neighbor. While dating appellant, Rives had frequently spent time with Freeman and his girlfriend. On November 24, Rives visited Freeman and his girlfriend at Freeman's house. Appellant knocked at the front door, asking to talk to Rives. When Rives went to the door, appellant asked her about a diamond ring that he had given her, wanting it back. When Rives said that she did not have the ring with her, appellant grabbed her arm and forced her outside. He took Rives over to his Chevy Blazer, which was parked in Freeman's driveway, and bent her on her back over the hood. Appellant put his left hand across Rives's chest to hold her down, reached for a shotgun with his right hand, and held it to Rives's forehead. Rives struggled with appellant and cried for help. Appellant did not say anything, but just looked angry. Rives feared that appellant was going to shoot her. They struggled over the shotgun until appellant put the weapon down and swung Rives forcefully across the yard. Appellant then came over to where Rives landed and kicked her repeatedly in the stomach.

Freeman testified that he came running from the house in response to Rives's cries. He knocked appellant down when appellant was kicking Rives, and he yelled for Rives to get to the house and call 9-1-1. Freeman saw Rives enter the house. When Freeman turned back to appellant, appellant was pointing a 12-gauge shotgun at him. Freeman told appellant that if appellant was

going to shoot him, appellant would have to shoot him in the back. Freeman turned around and quickly walked back to the house. Freeman heard a shot behind him and was terrified.[8] Freeman and Rives waited inside the house until several police cruisers arrived. Rives and Freeman both gave statements to the police. Rives received medical treatment and was released after a determination that the baby was unharmed.

Appellant was arrested and indicted for two counts of aggravated assault with a deadly weapon. But Rives reconciled with appellant, and he persuaded her to sign "a piece of paper" so that he would not go to jail. Appellant told Rives that if he were in jail, he could not help her with the children. Appellant also apologized and promised that he would not ever do it again. Rives testified that she did not knowingly agree to drop the charges against appellant; by signing the document, she thought that she was merely agreeing that he should not go to jail. Rives believed at the time that appellant should be punished in some way for what he had done, but she did not want that punishment to include jail time.

Freeman testified that Hazel called him within one week of the incident. Following the conversation with Hazel, Freeman called the police department and asked to drop the charges against appellant. The charges against appellant were reduced from aggravated assault with a deadly weapon to the offense of terroristic threat. Appellant pleaded guilty to the reduced charge on August 26, 1994.

Rives testified that no physical abuse occurred between the incident at Freeman's house and

---

[8] Thomas Tolson was the first patrol officer to arrive at the scene. Tolson testified that Rives, who was pregnant, was upset and crying, holding her side, and had visible scratches on her arm; Freeman was also upset and agitated. Tolson further testified that a spent shotgun shell for a 12-gauge shotgun was recovered from the scene. He stated that the shell would have had to have been actively "racked" in the shotgun before being fired, implying that the shotgun did not discharge accidentally.

the birth of James in April 1994. But in November 1994, appellant and Rives traveled to Ecuador for her to meet his biological family. A physical incident occurred there after Rives and appellant spent the evening at a bar. Rives testified that, although she and appellant both drank alcohol that evening, she was not drunk. She could not say whether appellant was intoxicated. After returning to their sleeping quarters at appellant's aunt's house, appellant became very angry and hit Rives twice in the stomach. Although the blows hurt and she was very upset, Rives lay down on the bed because she had nowhere to go if she left the premises. Appellant stayed in the room and did not say anything. The next morning, he apologized.

Appellant hurt Rives again in March 1995, when Rives and Hazel threw a small surprise party for him at Hazel's bar. Appellant initially seemed happy at the party, but matters changed when a physical altercation developed between two patrons. Appellant moved outside with the combatants and stood next to them, talking to them. Hazel asked Rives to get appellant away from the place, and Rives yelled at appellant, "Let's go." Eventually, appellant joined Rives at her car. Rives was standing outside the car on the passenger side, facing outward, with the door open. Appellant grabbed Rives by the arm, told her never to yell at him like that in front of his friends, and pushed her backward. After Rives fell back into the seat with her feet still on the ground, appellant slammed the car door across her legs. Rives testified that having the door slammed against her legs hurt and that she still bore an indentation in one leg from the incident. Afterward, Rives told appellant that he needed help and if he ever hit her again, she would leave him. Rives testified that appellant went to counseling, but she did not know for how long.

Appellant hit Rives again six months later, in September 1995, when the two traveled to San Francisco on a business trip. On the first night there, appellant became drunk and punched Rives

in the stomach several times when she would not have sexual intercourse with him. Although the punches hurt and she was scared, Rives did not leave because appellant took her plane ticket and money. When they returned to Houston, Rives ended the relationship.

Rives testified that when appellant was physically abusive he would also be verbally abusive. For example, he would tell Rives that no one would want her because she had two children and was not married. Rives also testified that appellant's violence was not just directed at her. She and appellant went to Hazel's bar frequently, and while there, Rives saw appellant engage in more than one bar fight. The fights ensued when appellant felt that someone had disrespected him. Rives testified that appellant would react to perceived disrespect by getting angry.

The state presented additional evidence concerning appellant's participation in fights through the testimony of two police officers who arrested appellant in September 1993 and June 1997 for public intoxication and disorderly conduct. Both arrests stemmed from reports of fighting. The arresting officer for the 1993 incident reported that appellant was intoxicated and abusive. The arresting officer for the June 1997 incident reported that appellant was highly intoxicated, shouted obscenities, and exhibited an aggressive demeanor. The jury also heard testimony that appellant had been convicted in 1991 for Driving While Intoxicated (DWI).

Appellant's daughter, Brittnie Rives, was twenty-one when she testified at his trial. Before the age of fourteen, Brittnie visited appellant twice a month and recalled when he began dating and later married Melissa. Brittnie lived with the couple from age fourteen to seventeen, when she moved out of appellant's home.

Brittnie testified extensively regarding appellant's manner of disciplining her. She testified that appellant had sometimes administered appropriate discipline. But most of the time, appellant

would become very violent and aggressive when he punished her. When Brittnie was six years old and in appellant's care, he became locked out of his residence one evening. The garage door was open slightly and appellant wanted Brittnie to squeeze through the space, go through the garage to the laundry room, enter the house, and let him in. Brittnie was afraid to enter the garage because it was dark and contained snakes, spiders, and bugs. When Brittnie resisted appellant's directive, he tried to force her under the garage door. In the process, appellant pushed Brittnie face-first into the concrete. Brittnie sustained painful scratches to her face when it hit the concrete. When Brittnie was between seven and eight years old, appellant threw her down a hallway and she received carpet burns when she skidded to a stop. When Brittnie was in high school, appellant would choke her, grab her under her arm and throw her, and use physical force to restrain her. When she was fourteen to fifteen years old, appellant threw Brittnie into a television set as a way of disciplining her. The force that appellant used re-tore ligaments that Brittnie had previously torn while playing soccer.

Appellant provided alcohol and marijuana to Brittnie and her friends and drank and smoked with them. After one such occasion, Brittnie was drunk, asleep on the couch, and alone at home with appellant. When she woke briefly during the night, appellant was on top of her, fondling her genitals under her pants. Brittnie went back to sleep, but confronted appellant the next morning. Appellant denied the accusation several times, but when Brittnie said that she would tell someone if he did it again, appellant said, "Okay," and asked her not to tell Melissa.

Appellant sometimes turned on Melissa when she interfered with his disciplining of Brittnie. On one of these occasions, appellant pinned Melissa against a wall. Brittnie testified that she witnessed many negative interactions between appellant and Melissa. Appellant was usually intoxicated when he came home and was verbally abusive toward Melissa, calling her "bitch" and

"lazy ass." He also frequently grabbed Melissa under the arm. In 2004, when Melissa was six months pregnant with Lucas, appellant pinned her against the wall. Brittnie testified that appellant sometimes moderated his behavior when he was sober, but his violent and abusive conduct was not limited to times when he was intoxicated.

Brittnie testified that she had a good relationship with both Melissa and Desirae and maintained it even after moving out of the house at age seventeen to escape from appellant's abuse. About one week before Melissa moved out, she spoke to Brittnie about "an incident" that had recently occurred. Melissa was crying and scared. On the day of the move, Melissa spoke to Brittnie of a second, intervening incident. As she had been during the previous conversation, Melissa was "very emotional," "crying," and "scared." Brittnie helped Melissa move. Melissa wanted to leave the house quickly, before appellant returned from work, and she took only a minimal amount of belongings for herself and the children. Brittnie also testified that she noticed a change in Desirae in the period preceding the murders. Desirae expressed "a lot of hatred" toward appellant and stayed in her room or otherwise avoided appellant when he was around.

Brooke Phillips, Melissa's sister, testified at the punishment phase and gave similar accounts of Melissa's and Desirae's demeanor and behavior in the time preceding the shootings. Phillips stated that she discussed personal topics with Melissa and had been aware of her sister's plan to move. Phillips testified that Melissa "cried a lot, . . . [and] was nervous [and] scared" when she decided to leave with the children. After the move, Melissa seemed more at ease. Through Phillips and another witness, the state presented evidence that, in early November 2009, Melissa had removed four handguns and a rifle from the family home and pawned them.

Regarding appellant's treatment of Desirae, Phillips recalled an incident in 2008 when

Desirae was about thirteen years old. Phillips's extended family, including Melissa, appellant, and their children, were vacationing together at a property owned by Phillips's grandmother. One evening, when they were playing cards on the patio, appellant became angry over something innocuous that Desirae said. He jumped from his seat and grabbed Desirae by the upper arm. Desirae seemed stunned and grew quiet. When Phillips confronted appellant about his behavior, he did not respond. As Desirae entered her teenage years, she remained communicative with Melissa and Phillips, but would withdraw when appellant was around.

The state additionally presented evidence that in June 2011, while appellant was incarcerated in the Harris County Jail awaiting trial for capital murder, a routine cell search revealed that he was hiding contraband pills in a baggy inside a jar of peanut butter. Appellant admitted that he purchased the pills from another inmate in administrative segregation and had managed to keep them in his cell, undetected, for over six months. The discovery of the contraband pills led to appellant's conviction for possession of a controlled substance.

Appellant's punishment evidence consisted of testimony from his adoptive and biological family; former coworkers and employees; the psychotherapist who treated him immediately before the offense; a psychiatrist; and an expert regarding the system of inmate classification at the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ). On cross-examination of appellant's family and friends, the state elicited evidence that appellant grew up in an extremely supportive, loving environment, in which nothing important was lacking, and he was taught right from wrong and how to behave. Both Hazel and Jim Cole admitted that appellant's temper had caused him problems and that they had intervened to smooth things over for him. Jim admitted that appellant had been fired from two different jobs, once due to appellant's conflict with a new

manager. Hazel admitted that appellant could be hot-tempered and had been verbally abusive to her, although he apologized afterward. Hazel also admitted that she had helped appellant try to come up with ideas for defending himself against the capital-murder charges. One of those ideas was to determine whether Melissa had drugs in her system when she died.

On cross-examination of appellant's former coworkers, the state elicited evidence that cast doubt upon appellant's theory that alcohol abuse or addiction played a pivotal role in appellant's commission of the offense. Appellant was never known to drink on the job or arrive at work intoxicated, and while working, he functioned at a high level. Despite being sober while at work, appellant consistently had some difficulty dealing well with customer complaints because he took customer dissatisfaction too personally. The state noted that appellant had physically intimidated a male employee by lifting the employee off his feet by the collar, and he had once reprimanded an employee so severely that he reduced the employee to tears. Although appellant sometimes drank alcohol to excess at company functions, his drinking on those occasions did not stand out to witnesses as particularly noteworthy. And even when drinking to excess at those functions, appellant's behavior did not turn violent.

Sharon Boyd, a psychotherapist, testified that she met with appellant on January 26, 2010, and again on the afternoon of February 3, 2010, the day before the offense. On January 26, when she learned that the reason for his visit was a recent marital separation, Boyd evaluated appellant for homicidal and suicidal ideation and psychosis. Appellant denied having any such feelings. Boyd concluded that appellant was not homicidal, suicidal, or psychotic, although he was mildly depressed and mildly anxious. Appellant, who then reported one week of sobriety, did not comply with Boyd's recommendations that he attend recovery meetings for alcoholics and enter an outpatient substance

abuse program.

On the afternoon of February 3, Boyd met with appellant for a second time. At this session, appellant specifically denied needing any help regarding homicidal or suicidal feelings or psychosis. Although Boyd observed that appellant was tearful, more anxious, and more depressed, she concluded that no homicidal or suicidal ideation or psychosis was present. She categorized appellant as "moderately depressed." Appellant, who then reported more than two weeks of sobriety, again declined to pursue Boyd's treatment recommendations, although he scheduled a third appointment with her. The session ended at 1:45 p.m. Appellant bought the murder weapon and ammunition less than an hour later and committed the murders the next evening.

Terry Rustin, a psychiatrist appointed to assist the defense, interviewed appellant. Rustin testified that appellant, who showed "a great deal of denial" during the interview, was alcohol dependent as well as an alcoholic. Rustin opined that, at the time of the murders, appellant was experiencing an adjustment disorder with a depressed mood stemming from Melissa's departure. Rustin opined that appellant's alcohol dependence, alcoholism, and period of abstinence from alcohol immediately before the shootings, together with appellant's adjustment disorder, played a role in the commission of the offense. Rustin stated that repeated episodes of withdrawal from alcohol use by an alcoholic leads to "more brain damage and more emotional damage" than staying continuously intoxicated. Rustin asserted that appellant's alcohol dependence and alcoholism could be treated even if appellant were imprisoned. On cross-examination, Rustin testified that appellant had poor impulse control, which could either be caused or exacerbated by alcohol abuse. Rustin also acknowledged that, at the Harris County Jail while awaiting trial, appellant had been discovered in possession of contraband drugs that would produce intoxicating effects similar to alcohol.

Through Rustin, appellant successfully offered into evidence the records of his medical treatment while in the Harris County Jail awaiting trial for capital murder. The records established that appellant admitted to "getting depressed and mad" in jail and that he refused to take medications prescribed by jail psychiatrists.

Viewed in the light most favorable to the verdict, the foregoing evidence is sufficient to sustain the jury's affirmative answer to the future-dangerousness special issue. Initially, we note the circumstances of the offense and the events surrounding it. *See Devoe*, 354 S.W.3d at 462; *Hayes*, 85 S.W.3d at 814. They support rational inferences of cold calculation, premeditation, and a wanton and callous disregard for human life. Appellant purchased the murder weapon the day before the homicides. *See Dinkins*, 894 S.W.2d 330, 360–61 (Tex. Crim. App. 1995) (concluding that the defendant's purchase of the murder weapon a day before a scheduled meeting with one of the victims supported a reasonable inference of pre-planning). Immediately before the shootings, appellant advised his ten-year-old son where to live if one or both of his parents died. Appellant also departed from his normal practice of merely dropping the boys off in the parking lot. Instead, appellant entered the small apartment, which was occupied by Melissa, the teenaged Desirae, and three children aged 10 years and younger, with a fully loaded semi-automatic pistol in his waistband. The fact that appellant "knowingly and willingly placed himself in, and sought after, circumstances facilitating homicide . . . demonstrates a callousness and lack of reflection about taking human life[,] which tends to increase the probability that he is a future danger." *See Rachal*, 917 S.W.2d at 807–08.

Although aware that he was in close proximity to three young children, appellant completely emptied the pistol's magazine into his victims, inflicting multiple fatal wounds at close range. *See*

*Dinkins*, 894 S.W.2d at 360 ("Appellant's infliction of multiple wounds at close range indicates a wanton and callous disregard for human life."). Appellant asserted that he did so because he was "angry and frustrated." Even if the jury had been inclined to find that Melissa's and Desirae's murders represented an isolated incident of rage, it "could [have] rationally conclude[d] from the results of appellant's isolated incident of rage that his rage is of such an uncontrollable and extreme nature that he is a continuing danger to society." *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995).

Desirae's killing is particularly telling. By appellant's own admission, he stepped over Melissa's body, followed Desirae into the back bedroom, and inflicted two mortal wounds because he was angry that the teenager was screaming at him. Evidence of such wanton, senseless killing supports the inference that appellant is a continuing danger to society. *See Coble*, 330 S.W.3d at 268 (discussing the future-dangerousness issue's emphasis on the defendant's internal restraints); *Sonnier*, 913 S.W.2d at 517. Given the evidence in the record that (1) Desirae and Chloe both witnessed the first shooting, (2) appellant shot and killed Desirae, and (3) appellant pointed his pistol at Chloe and made it go "click click" instead of "boom boom," the jury could also reasonably infer that appellant killed Desirae to eliminate her as a witness and would have killed Chloe, too, if any bullets had remained in his pistol. We have previously found killings motivated by the desire to eliminate witnesses to reflect a wanton and callous disregard for life, such that the circumstances of the offense are sufficient by themselves to support a finding of future dangerousness. *Dinkins*, 894 S.W.2d at 360. Alternatively, appellant's targeted aggression toward the only two children at the scene who were biologically related to Melissa, but not to him, supports a finding of vicious calculation. We conclude that the circumstances of the offense were sufficient to support the jury's

affirmative answer to the future-dangerousness special issue.

We also observe that, rather than turning himself in after the shootings, appellant—who later professed a desire that he would be caught and killed by police—fled the scene at high speed with an unrestrained two-year-old in the vehicle thereby prompting a manhunt, stole a large sum of cash from his employer, and intending to commit "suicide by cop," bought additional ammunition for his semiautomatic pistol. Such actions reflect forethought and intent to avoid capture, as well as a disregard for the lives of his pursuers and innocent others, including his own child, Lucas. *See Smith*, 74 S.W.3d at 872. The jury could further infer a lack of remorse from appellant's words and demeanor while speaking about the murders to Sgts. Chappell and Bush, a few hours after the shootings. Appellant appeared angry and expressed no remorse for having killed either of the two victims. Although appellant expressed regret that his sons had witnessed the shootings, he did so with a slight shrug and the statement, "Shit happens." *Cf. Estrada*, 313 S.W.3d at 28 n.9 (jury could reasonably infer lack of remorse from the evidence of appellant's demeanor, including his complaint, not long after he had brutally murdered his wife and their unborn child, that she "had ruined his life").

Moreover, appellant had a criminal history that included convictions for DWI in 1991, public intoxication in 1993 (stemming from fighting), terroristic threat in 1994, and public intoxication and disorderly conduct in 1997 (again based on fighting). Although we remain cognizant that each case must be determined on its own facts, *Estrada*, 313 S.W.3d at 284, we have found criminal records that are arguably less serious than appellant's to support a jury's finding that a probability of future dangerousness exists. *See, e.g., Lucio v. State*, 351 S.W.3d 878, 904 (Tex. Crim. App. 2011). Here, the evidence further reasonably suggested that, due to the intervention of appellant's adoptive parents

and appellant's manipulation of Rives, appellant's conviction record under-represented the seriousness of his criminal history, especially his assaultive behavior and use of a deadly weapon. *Cf. Williams v. State*, 937 S.W.2d 479, 484 (Tex. Crim. App. 1996) (a prior conviction for aggravated assault, a violent felony, is persuasive evidence of future dangerousness); *see Barley v. State*, 906 S.W.2d 27, 30–31 (Tex. Crim. App. 1995) (explaining that even a criminal history comprised of offenses that are not overtly violent can lead a reasonable juror to find a probability of future dangerousness when the offenses show an escalating and on-going pattern of disrespect and continued violations of the law).

Two former girlfriends, Leal and Rives, testified about the abuse he inflicted upon them. There was testimony that appellant physically and verbally abused Melissa, Desirae, and Brittnie, engaged in bar fights, and threatened his neighbor, Freeman, with a gun. Even his mother, who acknowledged that she would do anything to protect appellant, admitted that he had a temper and was sometimes verbally abusive to her.

The evidence, viewed in the light most favorable to the verdict, was sufficient to support the jury's affirmative answer to the future-dangerousness special issue. Point of error ten is overruled.

**Admissibility of Oral Statements**

In points of error one through four, appellant challenges the trial court's ruling on his motion to suppress the videotaped statement he made to Sgts. Chappell and Bush in Wharton County and his later videotaped statement to Officer Avila in Harris County. Appellant contends that the admission of his statements violated federal law under *Miranda v. Arizona*, 384 U.S. 436 (1966), and state law under Article 15.17.

We employ a bifurcated standard of review when reviewing claims concerning *Miranda*

violations and the admission of statements made as a result of custodial interrogation. *Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We measure the propriety of the trial court's ruling under the totality of the circumstances, extending almost total deference to the trial court's rulings on questions of historical fact, as well as on its application of law to fact questions that turn upon credibility and demeanor. *Id*. at 79; *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). We review *de novo* the trial court's rulings on questions of law and its rulings on application of law to fact questions that do not turn upon credibility and demeanor. *Pecina*, 361 S.W.3d at 79; *Leza*, 351 S.W.3d at 349. We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). On appeal, this Court "does not engage in its own factual review but decides whether the trial judge's fact findings are supported by the record. If the trial court's findings are supported by the record," we are "not at liberty to disturb them, and on appellate review, we address only the question of whether the trial court improperly applied the law to the facts." *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *see Dixon*, 206 S.W.3d at 590 ("We will sustain the lower court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case.").

The record reflects that the trial judge held a hearing on appellant's motion to suppress his statements. Trooper Mena, Justice of the Peace Cynthia Kubicek, Sgts. Bush and Chappell, and Officer Avila testified at the hearing. The evidence showed that, after Trooper Mena arrested appellant at a Wharton County Walmart, he took appellant before Wharton County magistrate

Kubicek, and she informed appellant of his rights.[9] In Wharton County, appellant gave a videotaped statement to Sgts. Chappell and Bush. Appellant was later transported to Harris County, where he gave a second videotaped statement to Officer Avila. The state introduced a number of exhibits for the trial court's consideration, including a completed and signed document captioned, "Wharton County Sheriff's Department Magistrate's Warning Certificate—Article 15.17 Texas Code of Criminal Procedure," and videotaped recordings of appellant's entire Wharton and Harris County statements. At the close of the evidence and after hearing argument, the trial court took appellant's motion to suppress under advisement. It subsequently ruled that it would grant the motion in part and deny it in part. The trial court denied the motion as to the beginning of appellant's Wharton County statement. It granted the motion as to the later part of the Wharton County statement, starting from appellant's statement, "I don't want to talk any more," through to the end.[10] But it denied the motion altogether concerning appellant's Harris County statement to Officer Avila. The trial court later supplemented the record on appeal with written findings of fact and conclusions of law concerning the voluntariness of appellant's statements.[11]

---

[9] Trooper Mena testified that, after he apprehended appellant, another deputy assisted him with handcuffing appellant and placing him in the backseat of a squad car. Appellant was then transported to the Wharton County Jail. Trooper Mena stated that neither he nor the assisting deputy gave appellant warnings pursuant to Article 38.22 or *Miranda*, but he also asserted that neither he nor his fellow deputy asked appellant any questions other than appellant's name.

[10] The videotaped statement reflected in State's Exhibit 8 has a total running time of twenty-eight minutes and ten seconds. Appellant's statement, "I don't want to talk any more," occurs at roughly the eleven-minute, thirty-five-second mark.

[11] On appeal, appellant asked us to abate this matter, stating that the trial court had not entered written findings of fact and conclusions of law concerning the voluntariness of his statements. We concluded that supplementation of the record, rather than abatement of the appeal, was appropriate. *See* TEX. R. APP. P. 34.5(c)(2). Accordingly, we directed the trial court to prepare and file its findings of fact and conclusions of law regarding this issue and instructed the trial court clerk to forward the supplemented record.

Although the findings refer to Officer Avila as "Sgt.," he identified himself at the beginning of his testimony as "Senior Police Officer Xavier Avila." We will therefore refer to him as Officer Avila.

In its written findings, the trial court found Trooper Mena, Justice of the Peace Kubicek, Sgts. Chappell and Bush, and Officer Avila to be credible and reliable witnesses. It made these factual findings regarding appellant's magistration:

22. Magistrate Kubicek first came into contact with Defendant Cole at approximately 1:15 [a.m.] on February 5, 2010, at the Wharton County jail. Defendant Cole indicated to Magistrate Kubicek he understood why he was in custody.

23. Magistrate Kubicek confirmed that Defendant Cole could speak and understand English. Magistrate Kubicek observed Defendant Cole to be awake, alert, and oriented.

24. Magistrate Kubicek read the warnings reflected on state's exhibit one[12] to Defendant Cole.

25. Defendant Cole appeared to understand the warnings read to him by Magistrate Kubicek and he did not ask any questions about the rights Magistrate Kubicek read to him from state's exhibit one.

26. Defendant Cole signed the warnings reflected on state's exhibit one in the presence of Magistrate Kubicek.

27. While advising Defendant Cole of the warnings reflected on state's exhibit one, Magistrate Kubicek further advised Defendant Cole that since the offense did not occur in Wharton County that he would not be appointed an attorney there but that he could retain his own or one would be appointed to him in Harris County.

28. Defendant Cole signed state's exhibit one acknowledging his right to request appointed counsel. However, Defendant Cole did not request appointed counsel while in Wharton County, Texas.

29. Defendant Cole did not request the appointment of counsel at any time while in Wharton County.

Regarding appellant's interview with Sgts. Chappell and Bush in Wharton County, the trial

---

[12] State's Exhibit 1 is a document entitled, "Wharton County Sheriff's Department Magistrate's Warning Certificate[,] Article 15.17 Texas Code of Criminal Procedure."

court found:

21. Both Sgt. Chappell and Sgt. Bush were present when Magistrate Kubicek read Defendant Cole magistrate warnings.

\*\*\*

30. Sgt. Chappell and Sgt. Bush observed Defendant Cole to be awake, alert, and oriented when he signed the magistrate form reflected in state's exhibit one.

31. After the magistrate warnings were read and signed, Sgts. Chappell and Bush took custody of Defendant Cole and entered an investigator's office at the Wharton County Sheriff's Office with Defendant Cole at approximately 1:44 am on February 5, 2010 and Sgt. Chappell advised Defendant Cole of his Miranda rights as reflected on state's exhibit 8.[13]

32. Sgt. Chappell advised Defendant Cole that he had the right to remain silent and not make any statement at all; that any statement he made may be used against him at his trial; that any statement he made may be used as evidence against him in court; that he had the right to have a lawyer present to advise him prior to and during any questioning; that if he was unable to employ a lawyer he had the right to have a lawyer appointed to advise him prior to and during any questioning; [and] that he had the right to terminate or stop the interview at any time.

33. Defendant Cole indicated he understood each right read to him by Sgt. Chappell. No promises or threats were made to Defendant Cole. Defendant Cole did not request a lawyer after Sgt. Chappell read the Miranda rights.

34. After advising Defendant Cole of his rights[,] Sgt. Chappell asked Defendant Cole if he wanted to talk about the events that occurred.

35. Defendant Cole replied, "Tell me what you know and I'll talk about it."

36. After Sgt. Chappell explained that was not the way he would proceed but rather wanted to hear the Defendant's side of what happened[,] Defendant Cole responded, "It's not going to happen tonight."

37. Sgt. Chappell then responded with[,] "It's not going to happen tonight?" Defendant Cole then said no and requested water and his shoes.

---

[13] State's Exhibit 8 is the first videotaped statement.

38. After Defendant Cole said[,] "It's not going to happen tonight," Sgts. Chappell and Bush stopped the questioning because they thought that statement was an invocation of Defendant Cole's right to remain silent.

39. As Sgt. Chappell started to leave the investigator's office to get the water and shoes, Defendant Cole volunteered, "You're right about one thing," reinitiating discussion of the investigation with the two sergeants.

40. Sgt. Chappell responded with[,] "Pardon me." Defendant Cole then stated, "You're right about one thing. It was not planned." Sgt. Chappell then left the investigator's office.

41. While Sgt. Chappell was out of the office, Sgt. Bush engaged in a general discussion with Defendant Cole but did not ask him any questions.

42. After providing Defendant Cole with water and shoes, Sgt. Chappell asked Defendant Cole if he was ready to go and Defendant Cole responded[,] "Ready to go to Harris County."

43. As Sgt. Chappell asked for car keys, Defendant Cole reinitiated a discussion about the case again and asked, "What do y'all want to know? What do I need to tell you?" Sgt. Chappell answered, "What happened."

44. Thereafter, Sgt. Chappell and Defendant Cole engaged in a discussion wherein Chappell advised Defendant Cole of the source of his information and Defendant Cole expressed his opinion about the quantity of evidence obtained by Chappell.

45. After continuing to engage in a discussion about the case with Sgt. Chappell and Sgt. Bush, Defendant Cole again invoked his right to remain silent when he stated, "I do not want to talk anymore." After Defendant Cole Defendant Cole stated that he did not want to talk anymore he immediately began to volunteer statements expressing his desire for the police to kill him. Chappell and Bush did not ask Defendant Cole any other questions at that time.

46. Immediately after Defendant Cole stated he did not wish to talk anymore, Chappell and Bush did not ask Defendant Cole any questions at that time. Defendant Cole, however, continued to talk[,] expressing his desire to die, concern for his children[,] and stating everything is gone.

47. Sgts. Chappell and Bush then continued to discuss the case further with Defendant Cole, and engaged in a general discussion with Defendant Cole about the offense, his work, his wife and his children. During the

discussion[,] Chappell and Bush asked Defendant Cole questions about the offense.

48.     Sgt. Chappell and Sgt. Bush concluded their interview with Defendant Cole in Wharton County at approximately 2:12 [a.m.] and then drove him to the Houston Police Department (HPD) homicide office. Upon arrival at HPD[,] Chappell and Bush turned over custody of Defendant Cole to Sgt. Avila at approximately 4:30 [a.m.] on February 5, 2010.

Concerning the interview with Officer Avila in Harris County, the trial court found:

49.     Sgt. Avila observed Defendant Cole to be awake, alert and oriented.

50.     Approximately three hours passed between Defendant Cole's invocation of his right to silence in Wharton County and when he was again interviewed by Sgt. Avila.

51.     An HPD crime scene unit officer made contact with Defendant Cole in the homicide office and tested his hands, took custody of his clothes[,] and photographed him.

52.     At approximately 5:05 [a.m.] on February 5, 2010, Sgt. Avila read Defendant Cole his Miranda rights as reflected on state's exhibit nine.

53.     Sgt. Avila advised Defendant Cole that he had the right to remain silent and not make any statement [and] that any statement he made may be used against him at his trial; that any statement he made may be used as evidence against him in court; that he had the right to have a lawyer present to advise him prior to and during any questioning; [and] that he had the right to terminate the interview at any time.

54.     Defendant Cole verbally indicated he understood each right and placed his initials next to each right on the warning form reflected in state's exhibit nine.

55.     After Sgt. Avila advised Defendant Cole of his rights, Defendant Cole invoked his right to counsel.[14]

56.     Sgt. Avila immediately ceased any attempt to interview [appellant],

---

[14]   In the record before us, appellant's statement to Officer Avila in Harris County (State's Exhibit 9) is divided into three consecutive parts. Part one has a running time of twelve minutes and twelve seconds. Appellant's invocation of his right to counsel occurs at approximately the four-minute, twenty-nine-second mark, during part one.

terminated the interview[,] and left the interview room to turn off the video recording device.

57. After turning off the recording device, Sgt. Avila returned to the interview room in which Defendant Cole was seated and began to explain the transport process to Defendant Cole.

58. After Sgt. Avila returned to the interview room, Defendant Cole reinitiated further discussion about the case when he asked if his ten-year-old son would have to testify.

59. Sgt. Avila answered Defendant Cole by stating it was possible.

60. Defendant Cole then advised Sgt. Avila that he changed his mind and wanted to give a statement about shooting his wife and stepdaughter.

61. Sgt. Avila again left the interview room to again turn on the video recording device.

62. After turning on the video recording device, Sgt. Avila returned to the interview room in the homicide office and asked Defendant Cole to confirm that a few minutes earlier he was advised of his rights and asked to initial each.

63. Defendant Cole confirmed his rights were read to him and that he understood each right.

64. Sgt. Avila reminded Defendant Cole that earlier he invoked his right to an attorney and Defendant Cole responded he changed his mind and further stated he was doing so voluntarily.

65. Sgt. Avila again read Defendant Cole his Miranda rights as reflected on state's exhibit nine.

66. Defendant Cole again verbally indicated that he understood each right.

67. Defendant Cole confirmed that he was initiating further conversation with Sgt. Avila.

68. Defendant Cole then freely and voluntarily waived his rights and gave a voluntary statement as reflected on state's exhibit nine.

69. Sgt. Avila did not force, threaten[,] or promise anything in exchange for

Defendant Cole's statements on state's exhibit nine.

In its conclusions of law, the trial court determined that appellant freely and voluntarily signed the warnings read to him by the magistrate judge, after acknowledging that he understood the warnings; when Sgt. Chappell subsequently read him his *Miranda* rights, appellant acknowledged that he understood those rights; and appellant never invoked his right to counsel while in Wharton County. The trial court concluded that appellant invoked his right to silence in Wharton County when he stated, "It's not going to happen tonight."[15] It further concluded that Sgts. Chappell and Bush scrupulously honored that invocation of appellant's right to silence and ceased questioning him until appellant re-initiated discussion of the case by stating, "You are right about one thing. It was not planned." The trial court also concluded that appellant voluntarily waived his *Miranda* rights when he re-initiated a discussion about his case with Sgts. Chappell and Bush, and that it was only after appellant's re-initiation of the discussion that Sgts. Chappell and Bush resumed the interview.

However, the trial court concluded that appellant unequivocally and unambiguously invoked his right to silence again in Wharton County when he stated, "I do not want to talk anymore," and that Sgts. Chappell and Bush did not honor appellant's re-invocation of that right. The trial court thus determined that appellant's subsequent statements to Sgts. Chappell and Bush in Wharton County after the re-invocation of his right to silence were recorded in violation of that right. In

---

[15]  The trial court concluded that appellant invoked his right to silence in Wharton County when he stated, "It's not going to happen tonight." However, we note the existence of cases which call into question whether that particular statement constituted a clear and unambiguous invocation of appellant's right to silence. *See Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996) (rejecting the appellant's argument that his statement—"I can't say more than that. I need to rest"—was an unambiguous invocation of his right to remain silent); *cf. Marshall v. State*, 210 S.W.3d 618, 628 (Tex. Crim. App. 2006) (concluding that, when the appellant re-initiated contact with the police to tell his side of the story, the trial court could reasonably have found that any invocation by the appellant of his right to remain silent was ambiguous, thereby permitting the officer either to continue questioning or stop the questioning to clarify whether the appellant really wanted to remain silent). The Court takes no position on whether appellant's statement was a sufficient invocation of his right to silence.

contrast, the trial court determined that appellant's statements to Sgts. Chappell and Bush in Wharton County preceding the re-invocation of his right to silence were freely and voluntarily given under Article 38.22. It also determined that the taking of those statements did not violate appellant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution or Article 1, Section 10, of the Texas Constitution.

Concerning appellant's Harris County statement to Officer Avila, the trial court concluded that the officer scrupulously honored appellant's invocation of the right to counsel by ceasing all questioning and terminating the interview. It further concluded that appellant re-initiated discussion about his case when he asked Officer Avila whether appellant's son would have to testify and then volunteered that he had changed his mind and wished to give a statement.

In point of error one, invoking *Miranda* and *Moran v. Burbine*, 475 U.S. 412 (1986), appellant alleges that he did not voluntarily, knowingly, and intelligently waive his right to counsel before Sgts. Chappell and Bush questioned him in Wharton County.[16] Appellant concedes that the magistrate read him a list of warnings and instructions regarding his rights—including his rights to remain silent, to hire an attorney, to have an attorney appointed, and to have an attorney present during any questioning by law enforcement—and asked appellant if he understood those rights. Appellant further concedes that he indicated to the magistrate that he understood those rights. The gravamen of appellant's complaint is that the magistrate immediately negated the prophylactic effect

---

[16] As we recognized in *Pecina*, the "rights created in *Miranda*, including the right to have counsel present during custodial interrogation, 'are not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" 361 S.W.3d at 74 n.16; *see also Contreras v. State*, 312 S.W.3d 566, 582 (Tex. Crim. App. 2010) ("*Miranda* does not set forth substantive constitutional rights with regards to interrogations; rather, that decision and its progeny set up rules for the admission of certain statements by the accused—excluding a statement under certain conditions when it is determined that law enforcement failed to observe certain practices during a custodial interrogation.").

of those warnings by informing appellant that he would not receive appointed counsel in Wharton County, because such counsel would be appointed in Harris County. Appellant contends that the magistrate affirmatively instructed him not to request an attorney in Wharton County. Appellant asserts that the magistrate's alleged affirmative instruction misled him and removed his freedom to invoke his right to counsel when Sgts. Chappell and Bush initially approached him and asked to interview him about the murder. Appellant argues that, accordingly, the trial court should have suppressed his entire Wharton County statement.

The Fifth Amendment precludes the government from compelling a criminal suspect to bear witness against himself. U.S. CONST. amend. V; *Pecina*, 361 S.W.3d at 74–75. In *Miranda*, the Supreme Court created safeguards to protect the privilege against self-incrimination in the inherently coercive atmosphere of custodial interrogations. *Pecina*, 361 S.W.3d at 75. In keeping with those safeguards, police officers must give *Miranda* warnings to a person who is in custody before questioning him. *Id.* Once an individual invokes his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by merely showing that the individual responded to police-initiated interrogation after being advised of his rights again. *Id.* (citing *Edwards v. Arizona*, 451 U.S. 477 (1981)). "Only if the person voluntarily and intelligently waives his *Miranda* rights, including the right to have an attorney present during questioning, may his statement be introduced into evidence against him at trial." *Id.*

To evaluate whether appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights, we look to the standard articulated by the Supreme Court in *Burbine*. *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010). Initially, appellant's relinquishment of his right to have counsel during interrogation must have been voluntary "in the sense that it was the product of a free

and deliberate choice rather than intimidation, coercion, or deception." *Id*. (quoting *Burbine*, 475 U.S. at 421). Appellant must have additionally waived the right to interrogation counsel "with full awareness of both the nature of the right [he was abandoning] and the consequences of the decision to abandon it." *Id*. "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension" may a court properly conclude that a defendant knowingly, intelligently, and voluntarily waived his right to interrogation counsel. *Id*. But "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Cobb v. State*, 85 S.W.3d 258 n.7 (Tex. Crim. App. 2002) (quoting *Burbine*, 475 U.S. at 427). The totality-of-the-circumstances approach requires consideration of all the circumstances surrounding the interrogation, including the defendant's experience, background, and conduct. *Id*. (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979), and *North Carolina v. Butler*, 441 U.S. 369, 375–76 (1979)). "[A] defendant's conduct—namely, willingly talking with investigators—can demonstrate a knowing, intelligent, and voluntary waiver of his *Miranda* rights." *Id.*

We conclude that it was within the trial court's discretion to determine that appellant voluntarily, knowingly, and intelligently waived his right to counsel before Sgts. Chappell and Bush questioned him in Wharton County. Regarding appellant's allegation that the magistrate's statement somehow misled him regarding his ability to invoke his right to counsel in Wharton County, we first note the Supreme Court's unequivocal statement that "[w]hat matters for purposes of *Miranda* and *Edwards* is what happens when the defendant is approached for interrogation, and (if he consents)

what happens during the interrogation—not what happened at any preliminary hearing." *Montejo v. Louisiana*, 556 U.S. 778, 797 (2009); *see Pecina*, 361 S.W.3d at 78 ("Distilled to its essence, *Montejo* means that a defendant's invocation of his right to counsel at his Article 15.17 hearing says nothing about his possible invocation of his right to counsel during later police-initiated custodial interrogation. The magistration event is not an interrogation event.").

We also reject appellant's characterization of the magistrate's statements regarding the appointment of counsel in Wharton County. The record supports a finding that the magistrate simply and accurately stated an administrative fact: should appellant request it, Harris County, rather than Wharton County, would handle the appointment of counsel.

Further, we do not think that the magistrate's statement placed appellant in an extraordinary position. Following his magistration, appellant was essentially in the same situation as a defendant who is arrested after a roadside stop and read his *Miranda* rights. The Fifth Amendment does not require police to have, in tow, lawyers who are ready to be appointed at a moment's notice to assist such defendants. *See Davis v. United States*, 512 U.S. 452, 460 (1994) ("In *Miranda* itself, we expressly rejected the suggestion 'that each police station must have a "station house lawyer" present at all times to advise prisoners,' and held instead that a suspect must be told of his right to have an attorney present and that he may not be questioned after invoking his right to counsel.") (internal citation omitted). "[T]he primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. 'Full comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.'" *Id*. (quoting *Burbine*, 475 U.S. at 427). Nor does the Constitution require immediate magistration. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (stating the general rule that jurisdictions

that provide judicial determinations of probable cause within forty-eight hours of arrest comply with the Fourth Amendment). What is critical is the individual's immediate ability to invoke his *Miranda* rights upon being placed in custody. The actual appointment of counsel—assuming that it occurs within a constitutionally reasonable time after the invocation of this right—is of lesser importance.

At the very most, this record supports a finding that there may have been some potential for confusion on appellant's part regarding his ability to obtain appointed interrogation counsel in Wharton County. But it was entirely within the zone of reasonable disagreement for the trial judge to find, as it implicitly did, that appellant experienced no actual confusion. Defense counsel argued that it was reasonable for appellant to interpret the magistrate's statement to mean that he could not obtain appointed counsel in Wharton County. However, appellant did not present any evidence from any source that he was actually confused by the magistrate's statements. The record is thus devoid of evidence that he was actually confused by the magistrate's statements and that, but for them, he would have invoked his right to counsel when Sgts. Chappell and Bush approached him. *Cf. Johnson v. State*, 286 S.W.3d 346, 353 n.13 (Tex. Crim. App. 2009) ("Defense counsel's argument to the [fact-finder] is not evidence.") (Keller, P.J., dissenting).

After reviewing the videotaped statement, we conclude that the totality of the circumstances surrounding the interrogation in Wharton County support the finding that appellant initially waived his right to counsel with full awareness of the nature of the rights being abandoned and the consequences of his decision to abandon them. *Joseph*, 309 S.W.3d at 27. Before Sgt. Chappell began reading appellant his rights, appellant acknowledged that he had just been before the magistrate. Appellant expressed no confusion regarding his right to counsel as explained by the magistrate. As Sgt. Chappell read each right to him again, appellant once more indicated his

understanding, answering, "Yes, sir" and nodding his head up and down. The warnings that Sgt. Chappell read to appellant at the beginning of the interview made appellant fully aware of his rights under *Miranda* and Article 38.22, as well as the consequences of abandoning those rights.

Immediately after reading warnings to appellant, Sgt. Chappell asked whether appellant wanted to talk to the officers regarding the offense. Appellant did not ask for a lawyer. Instead, he promptly responded, "Tell me what you know and I'll talk about it." When appellant later stated, "It's not going to happen tonight," the officers did not resort to physical or psychological pressures to elicit further statements. Rather, the videotape clearly shows that Sgt. Chappell began to leave the interview room to retrieve appellant's shoes and get him water, as appellant had requested.

When Sgt. Chappell began to leave the interview room, appellant stopped the detective and spontaneously offered, "You're right about one thing." When Sgt. Chappell responded, "Pardon me?" appellant repeated himself, stating, "You're right about one thing. It was not planned." When Sgt. Chappell returned to the interview room with appellant's shoes and water, appellant directly asked the officers, "What do y'all want to know? What do I need to tell you?" After Sgt. Chappell answered that the officers needed to know "[w]hat happened," appellant did not invoke his right to counsel, but instead discussed the offense.

Under the totality of the circumstances, it was within the zone of reasonable disagreement for the trial court to admit the first part of appellant's Wharton County statement. Point of error one is overruled.

In point of error two, appellant alleges that Sgts. Chappell and Bush did not scrupulously honor his right to silence after he said, "I don't want to talk anymore," in his Wharton County statement. Appellant further asserts that the statement he gave to Officer Avila in Harris County was

the result of a conspiracy between Sgt. Chappell and Officer Avila to convince him to relinquish the right to silence that he had previously invoked in Wharton County. For these reasons, appellant argues, the factors set forth by the Supreme Court in *Michigan v. Mosley*, 423 U.S. 96 (1975), required the trial court to suppress his Harris County statement to Officer Avila.

In *Mosley*, the Supreme Court "addressed the circumstances under which the prosecution is prohibited from using a defendant's in-custody statement obtained by police who have renewed interrogation after the defendant has invoked his right to remain silent." *Murphy v. State*, 766 S.W.2d 246, 248 (Tex. Crim. App. 1989). The Court rejected the defendant's argument that, once the person has invoked his right to silence, further questioning of an individual in custody represented a *per se* violation of the protections set out in *Miranda*. *Mosley*, 423 U.S. at 102–03 ("Clearly, [nothing] in the *Miranda* opinion can be sensibly read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent."). Rather, the Court concluded that, under *Miranda*, "the admissibility of the statements obtained after the person in custody has decided to remain silent depends on whether" law enforcement authorities "scrupulously honored" the person's "right to cut off questioning." *Id.* at 104. The factors relevant to the *Mosley* analysis are (1) whether the suspect was informed of his right to remain silent before the initial questioning; (2) whether the suspect was informed of his right to remain silent before the subsequent questioning; (3) the length of time between initial questioning and subsequent questioning; (4) whether the subsequent questioning focused on a different crime; and (5) whether police scrupulously honored the suspect's initial invocation of the right to remain silent. *Maestas v. State*, 987 S.W.2d 59, 62 (Tex. Crim. App. 1999). We have also emphasized that "whether a resumption of questioning is consistent with

'scrupulously honoring' the right to remain silent depends on the unique facts and circumstances of each case." *Id*. at 63.

We may quickly dispose of the first, second, and fourth *Mosley* factors. As appellant concedes and the record reflects, he was advised of his right to remain silent before both his Wharton and Harris County interviews. Thus, *Mosley*'s first and second factors weigh in favor of a finding that the officers scrupulously honored his right to silence. Because the questioning by Sgts. Chappell and Bush in Wharton County and by Officer Avila in Harris County related to the same offense, we find that the fourth *Mosley* factor weighs against a finding that law enforcement scrupulously honored appellant's invocation of his right to silence.

We now turn to *Mosley*'s third factor: the length of time that passed between Sgts. Chappell's and Bush's initial questioning of appellant in Wharton County and Officer's Avila's subsequent request to interview appellant in Harris County. The trial court found that roughly three hours passed between these two events. Appellant offered no contrary evidence at the suppression hearing. We note that in *Mosley* itself, "an interval of more than two hours" passed between the initial and subsequent questioning at issue. 423 U.S. at 104. Moreover, the Supreme Court described this interval as "the passage of a significant period of time." *Id*. at 106. Because the passage of almost three hours in appellant's case exceeds the "significant period of time" in *Mosley*, the third *Mosley* factor weighs in favor of a finding that law enforcement "scrupulously honored" appellant's right to cut off questioning.

On appeal, appellant argues that we should discount this significant interval because he was in the presence of HPD officers for the entirety of that period and thus "never removed from an interrogation environment." We do not find appellant's argument persuasive. The trial court

expressly found that Sgts. Bush and Chappell "concluded their interview with [appellant] in Wharton County at approximately 2:12 [a.m.]" and then drove him to the HPD homicide. This finding implies that Sgts. Bush and Chappell engaged in no further questioning of appellant after departing Wharton County for Harris County. The record supports this implicit finding, and accordingly, we defer to it. *Romero*, 800 S.W.2d at 543. Both Sgts. Bush and Chappell testified that, other than Sgt. Bush responding to a few questions from appellant at the beginning of the ride to Harris County, neither detective engaged appellant in further conversation, much less interrogation. Sgt. Chappell further testified that appellant fell asleep in the back of the police vehicle during the trip to Harris County. Officer Avila testified that, after transport to Harris County, he did not immediately attempt to interrogate appellant. Rather, Officer Avila had a Crime Scene Unit officer photograph appellant, collect his clothes, and test his hands for gunshot residue.[17] Appellant did not dispute the officers' testimony. While appellant was certainly in custody during the three-hour interval, there is no evidence that, during that time, he was subjected to "interrogation" within the meaning of *Miranda*. *See Rhode Island v. Innis*, 446 U.S. 291, 299 (1980) ("'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."). We decline to find that an "interrogation environment" existed during those three hours because there is no evidence that any law-enforcement officer actually tried to interrogate appellant during that interval. *See id.*

Concerning the fifth and final *Mosley* factor, i.e., whether police scrupulously honored the

---

[17]  These are the types of activities that the Supreme Court has excluded from the self-incrimination privilege that the Fifth Amendment protects. *See Jones v. State*, 795 S.W.2d 171, 175 (Tex. Crim. App. 1990) (noting the various police practices that the Supreme Court has excluded from the scope of the self-incrimination privilege because they seek only physical evidence, not testimonial confessions of guilt).

suspect's initial invocation of the right to remain silent, appellant focuses on the trial court's finding that Sgts. Chappell and Bush did not scrupulously honor appellant's Wharton County invocation. But the trial court's finding is not dispositive of appellant's second point of error, given the unique facts and circumstances of this case. *See Maestas*, 987 S.W.2d at 63. The trial court also found that Officer Avila scrupulously honored appellant's invocation of the right to counsel by immediately terminating the Harris County interview when appellant invoked that right. Rather than giving his Harris County statement to Officer Avila because he failed to scrupulously honor appellant's invocation of his *Miranda* rights, appellant gave his statement to Officer Avila despite the officer's scrupulous honoring of appellant's *Miranda* rights. Officer Avila read appellant his *Miranda* rights and then immediately terminated the interview when appellant invoked his right to counsel. Appellant then re-initiated discussion of his case with Officer Avila, who read him his rights again, and appellant expressly waived them. Only then did Officer Avila interview appellant about the offense and obtain the statement at issue. Point of error two is overruled.

In point of error three, appellant alleges that the trial court erred in admitting his Harris County statement because Officer Avila intentionally dishonored appellant's invocation of the right to counsel. Citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983) (plurality op.), appellant focuses on one line of Officer Avila's hearing testimony: after terminating the first interview and turning off the videotape, Officer Avila re-entered the interview room to inform appellant about "what was going to happen to him." Appellant contends that, under *Bradshaw*, telling appellant "what was going to happen to him" was tantamount to Officer Avila re-initiating custodial interrogation after appellant had invoked his right to counsel. Invoking *Innis*, appellant further asserts that Officer Avila's response to appellant's ensuing question—regarding whether appellant's

ten-year-old son would have to testify—was a statement that Officer Avila should have known would elicit an incriminating response. Appellant's arguments have no merit.

Initially, *Bradshaw* is inapposite. In that case, the Supreme Court "clarified the *Edwards* rule and established a two-step procedure to determine whether a suspect has waived his previously invoked right to counsel." *Cross v. State*, 144 S.W.3d 521, 526–27 (Tex. Crim. App. 2004) (discussing *Bradshaw*'s import). *Bradshaw* did not concern what words or actions by police officers may rise to the level of "interrogation" within the meaning of *Miranda*. Rather, *Innis* squarely addressed that issue and thus represents the applicable authority.

But appellant's reliance on *Innis* is likewise unavailing. In *Innis*, police officers arrested the defendant in connection with the death, by shotgun blast, of a taxicab driver. 446 U.S. at 293–94. After officers read Innis his *Miranda* rights, he invoked his right to counsel. *Id*. at 294. The officers did not thereafter attempt to question Innis. *Id.* at 294–95. But while they were transporting him from the arrest site to the police station, two officers engaged each other in a conversation within Innis's hearing. *Id.* During that conversation, the officers discussed the missing shotgun, noting the presence in the neighborhood of a school for handicapped children and expressing their concerns over what might happen if any of the children discovered the weapon. *Id.* Innis interrupted the conversation, telling the officers to turn the car around so that he could show them the location of the missing shotgun. *Id.* at 295. The officers drove Innis back to the scene of his arrest. *Id.* After receiving an additional set of *Miranda* warnings, Innis stated that he understood those rights but "wanted to get the gun out of the way because of the" school children. *Id.* Innis then led officers to the hidden shotgun. *Id.* The trial court denied Innis's subsequent motion to suppress the shotgun and his statements to police regarding it. *Id*. at 295–96. But the state supreme court set aside Innis's

conviction on the grounds that the officers had subjected him to "'subtle coercion' that was the equivalent of 'interrogation'" under *Miranda*. *Id*. at 296–97.

The Supreme Court disagreed. It first clarified that "interrogation" for *Miranda* purposes means express questioning or "its functional equivalent": "[A]ny words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 300–01 (internal footnote omitted). But the Court also noted that police "surely cannot be held accountable for the unforeseeable results of their words or actions." *Id*. at 302–03. Considering the facts of Innis's case, the Court rejected the notion that the police officers, through their conversation in Innis's hearing, had subjected him to the functional equivalent of interrogation under *Miranda*. *Id.* at 302. The conversation between the officers was brief, as opposed to a "lengthy harangue"; their comments were not particularly "evocative"; and there was nothing in the record to suggest that the officers were aware that Innis was particularly susceptible to an appeal to his conscience concerning the safety of handicapped children. *Id.* at 302–03. In short, the Court concluded, it "[could not] say that the officers should have known that it was reasonably likely that Innis would so respond." *Id*. at 303.

Turning to the record before us, we discern no conduct by Officer Avila that approaches even the level of "subtle coercion" that the Supreme Court, in *Innis*, found not to represent interrogation for *Miranda* purposes. His uncontradicted testimony was that he re-entered the interview room after terminating the interview and leaving the room to turn off the videotape and that his general purpose was "to inform [appellant] of the process, what was going to happen to him." When asked specifically what he said to appellant, Officer Avila testified, "I told him that I was going to call for a marked unit to come and pick him up and take him to the city jail while—so we could contact the

district attorney and run the case." Officer Avila agreed that by "run the case," he meant "get the charge filed." Officer Avila's brief statement to appellant was not one that could reasonably be expected to elicit an incriminating response. To the extent Officer Avila mentioned that appellant would be transported to the jail, his Avila's statement is akin to a question normally attendant to arrest and custody, which is excluded from the self-incrimination privilege that the Fifth Amendment protects. *See Jones*, 795 S.W.2d at 175. To the extent Officer Avila referred to the fact that the police would pursue charges against appellant, we cannot conclude that he could have reasonably expected the statement to elicit an incriminating response. *See United States v. Collins*, 683 F.3d 697, 703 (6th Cir. 2012) ("An accurate statement made by an officer to an individual in custody concerning the nature of the charges to be brought against the individual cannot reasonably be expected to elicit an incriminating response."); *United States v. Payne*, 954 F.2d 199, 202 (4th Cir. 1992) ("[T]he *Innis* definition of interrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police concerning the nature of the charges against the suspect and the evidence relating to those charges."); *Plazinich v. Lynaugh*, 843 F.2d 836, 839 (5th Cir. 1988) ("It is difficult to conceive . . . that the informational comment made to a defendant can be so 'overrreaching' as to violate the spirit of *Edwards*."). We conclude that Officer Avila did not initiate an interrogation within the meaning of *Miranda* by making this statement.

Officer Avila testified that, after he told appellant about his pending transport to the city jail and that he would present the case to the district attorney, appellant asked whether his "10-year-old son was going to have to go to court and testify." Officer Avila responded that "there was a possibility that [appellant's son] might have to do that." Appellant then "said that he had changed his mind and he wanted to give a statement." Officer Avila, whom the trial court found to be a

credible witness, asserted that this exchange represented the entirety of the conversation that he had with appellant before restarting the videotape. We decline to "propound a rule that police officers may not answer direct questions even in the most cursory and responsive manner." *United States v. Taylor*, 985 F.2d 3, 8 (1st Cir. 1993).

Further, although Sgt. Chappell testified that, during the interview in Wharton County, appellant showed some concern over the prospect of his son having to testify at trial, he also testified that he did not tell Officer Avila anything regarding appellant's concern.[18] Sgt. Chappell also stated that he and Officer Avila did not, at any time, watch appellant's videotaped Wharton County statement together. Officer Avila testified that, before interviewing appellant in Harris County, he had only Sgts. Chappell's and Bush's brief synopsis of their Wharton County interview with appellant. He did not recall that the synopsis included information about appellant showing concern over his son having to testify. Officer Avila testified that he learned that information only after taking appellant's Harris County statement. Appellant offered no contrary evidence at the suppression hearing. We cannot conclude that Officer Avila could have reasonably expected the statement to elicit an incriminating response. Point of error three is overruled.

In point of error four, appellant argues that the trial court reversibly erred in admitting any of appellant's Wharton and Harris County statements at trial because the magistrate judge violated Article 15.17. Specifically, appellant contends that the magistrate violated Article 15.17 because she did not cause the magistration to be recorded and because she "told [appellant that] appointed counsel would not be provided."

---

[18] The portion of the videotaped statement in which appellant expressed concern about his son testifying fell within the segment of State's Exhibit 8 that was excluded from evidence, pursuant to appellant's motion to suppress.

Concerning the failure to record the magistration, the state argues that appellant failed to argue at trial that his statements were inadmissible on this basis, and therefore failed to preserve the issue for appeal. We have reviewed the record, which reflects that appellant did not raise the failure-to-record argument in either his written motion to suppress or in his arguments at the hearing on the motion to suppress. While we agree that appellant failed to preserve this argument for our review, TEX. R. APP. P. 33.1(a), in the interest of completeness, we will address appellant's claim.

The allegation that the magistrate "told [appellant that] appointed counsel would not be provided" lacks merit. As we discussed in point of error one, we reject appellant's characterization of the magistrate's statements regarding the appointment of counsel in Wharton County. The record supports a finding that the magistrate simply and accurately stated an administrative fact: that Harris County, rather than Wharton County, would handle the appointment of counsel, should appellant request it.

Further, even assuming for purposes of argument that the magistrate's statement could be considered error under Article 15.17, it was cured when appellant received the requisite admonishments regarding the provision of counsel from Sgt. Chappell before being interviewed in Wharton County. Alternatively, the error was harmless, as it did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2 (b). Point of error four is overruled.

### Admission of Autopsy Photograph

In point of error five, appellant contends that the trial court erred when, over appellant's Rule 403 objection, it admitted State's Exhibit 158 into evidence at the guilt-innocence phase during Dr. Albert Chu's testimony. *See* TEX. R. EVID. 403. Dr. Chu, an assistant medical examiner at the Harris County Institute of Forensic Sciences, testified that he performed Desirae's autopsy and that

the photograph represented by State's Exhibit 158 depicted an incision he made to the left side of Desirae's back during the procedure. Dr. Chu told the jury that he made the incision to retrieve a bullet that had entered Desirae's body from the front, penetrated her sternum, hit her heart and left lung, and lodged in the tissue on the left side of her back. Dr. Chu further testified that he submitted the bullet he recovered from the incision to the firearms laboratory for comparison to any weapon recovered in the case. On appeal, appellant complains that the photograph was "repetitious and gruesome."

Rule 403 requires that a photograph possess some probative value and that its inflammatory nature does not substantially outweigh that probative value. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009); *Long v. State*, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991). In ruling on a Rule 403 objection, the trial court must "consider the inherent tendency that the evidence may have to encourage resolution of material issues on an inappropriate emotional basis." *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992) (internal quotations and alterations omitted). The trial court must then balance that inherent tendency, if any, against "the host of factors affecting probativeness, including the relative weight of the evidence and the degree to which its proponent might be disadvantaged without it." *Id.* Rule 403 favors the admission of relevant evidence and presumes that relevant evidence will be more probative than prejudicial. *Rayford v. State*, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003); *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002).

In determining whether the danger of unfair prejudice substantially outweighs a photograph's probative value, a court may consider many factors. *Williams*, 301 S.W.3d at 690. These include: the number of such photographs the proponent offers; their gruesomeness; their level of detail; their

size; whether they are in color or black-and-white; whether they are close-ups; whether they depict a clothed versus a naked body; the availability of other means of proof; and other circumstances unique to the individual case. *Id.* "It is also relevant for the trial court to consider whether the body as photographed has been altered since the crime in some way (e.g., by autopsy) that might enhance its gruesomeness to the defendant's detriment." *Narvaiz*, 840 S.W.2d at 429. Autopsy photographs are generally admissible unless they do not aid the fact finder in determining the injuries alleged to have been inflicted by the defendant, but rather emphasize solely mutilation of the victim caused by the autopsy itself. *See Williams*, 301 S.W.3d at 690. Further, "changes rendered by the autopsy process are of minor significance if the disturbing nature of the photograph is primarily due to the injuries caused by the appellant." *Hayes*, 85 S.W. 3d at 816. We review for an abuse of discretion a trial court's decision to admit photographs over an objection. *Williams*, 301 S.W.3d at 690.

During Dr. Chu's testimony, the state moved to admit a total of six photographs taken at Desirae's autopsy, including State's Exhibit 158. Appellant objected to State's Exhibit 158 under Rule 403, on the grounds that the photograph was "overly grotesque." The state countered that the photograph represented by State Exhibit 158 was the only one that showed the recovery of that particular bullet from Desirae's body and that the bullet was sent to the firearms laboratory and ultimately matched to the pistol found in appellant's vehicle. After reviewing the other photographs from Desirae's autopsy, the trial court overruled appellant's objection, stating that the court found the exhibit relevant and that its probative value substantially outweighed its potential for unfair prejudice.

The photograph in question is in color, measures roughly eight-and-a-half by eleven inches, and is not a close-up view. Moreover, it is only one of a small number of photographs of Desirae's

autopsy shown to the jury and the only one portraying this specific view. Although Desirae's body is shown unclothed and a small portion of her buttocks is visible at the bottom of the frame, that is not the focus of the photograph, which is overwhelmingly clinical in nature. Dr. Chu's neat surgical incision appears slightly above the middle of the photograph. Although the record does not reveal the scale of the photo, the incision appears to be no more than a few inches long. Dr. Chu's gloved fingers are visible, using forceps to retract the skin to more clearly reveal a bullet lodged in the exposed tissue. Although pink and darker red tissue are visible within the incision site, as is a bullet slug, the wound is not bloody. Contrary to appellant's characterization, the incision with the skin pulled away slightly is not especially gruesome. To the extent that the photograph is disturbing, it is because of the injury that appellant inflicted on Desirae by shooting her. The alteration to her body caused by the autopsy, in an effort to retrieve the fatal bullet, pales in significance. *See Hayes*, 85 S.W.3d at 816.

The trial court was well within its discretion to find that the photograph's probative value substantially outweighed its potential for unfair prejudice. Point of error five is overruled.

**Cross-examination of Punishment-phase Defense Witness**

In points of error six through eight, appellant challenges the trial court's ruling that allowed the state to cross-examine defense witness Frank Aubuchon regarding a statistical report generated by TDCJ's Emergency Action Center (EAC). Specifically, in points of error six and seven, appellant argues that the trial court should have sustained his objections to the state's line of questioning as irrelevant and unfairly prejudicial under Rule 403. In point of error eight, appellant contends that, by allowing the state to question Aubuchon regarding the report, the trial court violated his Eighth Amendment right to an individualized sentencing determination. *See Woodson v. North Carolina*,

428 U.S. 280, 304 (1976) (plurality op.).

Aubuchon testified on direct examination that he had worked for TDCJ in inmate classification, at the unit level, for many years. At the time of trial, he made a living testifying in court concerning TDCJ's prisoner-classification procedures and security measures. Aubuchon testified that there were then 111 TDCJ units, with a maximum capacity of approximately 160,000 offenders. He told the jury that TDCJ facilities are divided into five different security levels, with level five (i.e., maximum security) units being the most secure and level one ("trustee camps") being the least secure. Within those maximum-security units, Aubuchon explained, there are two populations of inmates: those in "general population" and those in administrative segregation, a more restrictive custody environment. Inmates in general population are assigned custody classifications on a scale that runs from G-1 to G-5, with G-5 being the most restrictive custody class outside of placement in administrative segregation.

Aubuchon testified that, if sentenced to life without the possibility of parole, appellant would be assigned to one of the eighteen maximum-security units within the TDCJ system, which he described as being large facilities housing approximately 2,000 inmates each. Aubochon described in detail the construction and security measures in place at such facilities. He asserted that all movement within the maximum-security units is well contained and controlled. Although inmates are not always individually escorted within the units, all inmates are always within sight, sound, or camera view of correctional staff. Aubuchon further testified that, assuming that appellant was assigned to general population, he could never achieve a less-restrictive custody classification than G-3, which Aubuchon characterized as "very restrictive." For example, Aubochon asserted that, as a G-3 inmate, appellant would be limited to working in the kitchens and laundry because he could

not be assigned to jobs providing him access to vehicles, tools, or loading docks or to jobs involving contact with non-uniformed female employees such as doctors, nurses, or teachers. Aubuchon also asserted that prison staff make virtually all decisions regarding where an inmate may go within the unit and when. When an inmate is not assigned to be at work, he may choose to spend time in the recreation area, day room, or his cell, according to the schedule for his particular cell block. Aubuchon also told the jury that TDCJ was in the process of installing closed-circuit television monitors throughout its facilities so that there would be no place where an inmate could be without being subject to remote monitoring and recording. At the conclusion of direct examination, defense counsel engaged Aubuchon in the following colloquy:

> Q. Is TDCJ a perfect prison system?
> A. No, sir.
> Q. Is there any perfect prison system that you know of?
> A. No, sir.
> Q. Based on the time that you worked and what you know about the prison system, is it a pretty good one?
> A. Tremendous strides have been made in the last 30 years from going to convict guards to where we are now.
> Q. Is it a fairly secure place?
> A. I believe so.

On cross-examination, the state probed Aubuchon's testimony concerning the restrictions attendant upon G-3 classified inmates. The state elicited testimony supporting a reasonable inference that, even as a G-3 classified inmate, appellant would have opportunities and the means by which to commit violent acts. The state then focused on Aubuchon's testimony that, although not a perfect system, TDCJ was "a fairly secure place": "[Defense counsel] asked you whether [TDCJ] was perfect and you said no, but you feel like it's fairly safe, right?" Aubuchon responded, "Yes,

ma'am," agreeing with or adopting the prosecutor's interpretation of his earlier testimony.[19] At this point, the prosecutor began to inquire into Aubuchon's familiarity with the statistical prison-crime reports generated by EAC, specifically those generated for the current year.

The inquiry prompted a bench conference at which defense counsel objected to the state being allowed to question Aubuchon regarding the specific number of various offenses listed in the report. The defense argued that appellant "should be sentenced based upon his conduct and not the conduct of other prisoners" and that to allow questioning about the specific number of offenses was unfairly prejudicial under Rule 403.

The trial court "agreed . . . 100 percent . . . that the jury [was] to consider [appellant] and his conduct and not the conduct of others." But, it elaborated:

> I think that there has been an effort by the defense, and certainly understandable, to educate the jury on where [appellant] would be housed, what kind of security levels it might [entail], and things he's allowed to do, and essentially suggested through this witness that—based on the answer to the last question that it's a fairly safe place[.] I think if the State is in possession of information that calls that opinion to be questioned or at least [gives] the jury some other information to consider in evaluating that answer, I think that the rules allow that.

After entertaining additional argument, the trial court overruled the defense's objection, finding that the state's line of cross-examination regarding the EAC statistics was relevant and that its probative value was not outweighed by any unfair prejudice. It granted appellant a running objection.

---

[19] We recognize that "safe" and "secure" are, sometimes but not always, synonyms. "SAFE, SECURE may both imply that something can be regarded as free from danger. These words are frequently interchangeable. SAFE, however, is applied rather to a person or thing that is out of or has passed beyond the reach of danger. *The ship is safe in port.* SECURE is applied to that about which there is no need to fear or worry: *to feel secure about the future*; . . .." Webster's Encyclopedic Unabridged Dictionary of the English Language 1259-60 (1989).

In the prison context, "safe" may mean that inmates are free from danger, while "secure" can mean that inmates are free from danger or that the physical boundaries of the prison cannot be breached by escape. It appears from the record that the state used "safe" as a synonym for "secure."

The state continued its cross-examination regarding the EAC statistics. It elicited testimony that in the month of August 2011, TDCJ recorded 1760 serious[20] or "unusual" incidents within its system. Although there were no escapes or attempted escapes reported, there had been 108 possessions of weapons; twenty-four alleged sexual assaults; three serious staff assaults; 127 serious offender assaults; and forty-one "chunkings."[21] It elicited testimony that, year-to-date, TDCJ had recorded 12,550 serious or unusual incidents: 731 weapons possessions; 239 alleged sexual assaults; fifty-eight serious staff assaults; 864 serious offender assaults; and 278 chunkings. Aubuchon agreed that despite the measures TDCJ had taken or might take, incidents still occurred and would continue to occur. The state then left the subject of the EAC report and resumed questioning Aubuchon about the restrictions on G-3 classified inmates and the opportunities and means those inmates have to commit violent acts, despite those restrictions.

On redirect, the defense attempted to counter Aubuchon's cross-examination testimony regarding the EAC reports. In response to defense questioning, Aubuchon testified that the EAC statistics did not surprise him because there have always been some serious incidents occurring within the penitentiary. Aubuchon opined that, if anything, the ratio of serious incidents to inmates reflected in the report was surprisingly low given that 56% of inmates are in TDCJ for violent, "3g" offenses.[22] Aubuchon further noted that the EAC statistics reflect only the total number of incidents,

---

[20] Aubuchon agreed that "serious" staff and offender assaults were those that required more than first aid and did not reflect the minor assaults that occurred within the TDCJ system.

[21] Aubuchon defined "chunking" as the act of an offender mixing a variety of fluids and solids (generally, urine and feces) and sometimes other material and throwing the mass into the hands or face of a correctional officer.

[22] *See Plummer v. State*, 410 S.W.3d 855, 861 n.42 (Tex. Crim. App. 2013) (defining "3g" offenses as those set forth in Article 41.12, section 3(g)(a)(1), and noting that "[a]lmost all of these listed offenses are violent acts involving physical threat or harm.").

without regard to whether the same inmate may be responsible for multiple incidents. Aubuchon acknowledged that even an inmate in administrative segregation could engage in criminal conduct. But he also noted that appellant, who had been housed in administrative segregation while in the Harris County jail, had no record of committing assaultive conduct during his detention.

On recross-examination, the state elicited testimony that, despite what Aubuchon characterized as a low ratio of violence to the total number of inmates, three homicides had occurred within TDCJ in the current year to date. Aubuchon also acknowledged that, given his experience and the number of violent offenders in TDCJ, it would not have surprised him for the number of serious incidents to be higher. Aubuchon further acknowledged that he could not know whether appellant would engage in assaultive behavior in TDCJ. On re-redirect examination, Aubuchon opined that TDCJ's security controls worked and were responsible for the "low" incidence of violence relative to the number of inmates.

Although appellant contends that the state's line of questioning was not relevant under Rule 403, we perceive no error in the trial court's contrary conclusion. Rule 403 requires that the evidence at issue be both relevant and not unfairly prejudicial. *See* Tex. R. Evid. 403. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401. At the punishment phase of appellant's capital-murder trial, the court tasked the jury with determining, *inter alia*, whether there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. *See* Art. 37.071, § 3(b)(1). It is well established in our case law that "society" includes both prison and free world. *Lucio v. State*, 351 S.W.3d 878, 903 (Tex. Crim. App. 2011). Evidence regarding whether

the prison environment offers opportunities for violence was relevant to the jury's future-dangerousness determination, as was evidence concerning the efficacy of TDCJ's measures to control such opportunities. Here, such evidence was introduced by defense counsel. The state was therefore entitled to probe Aubuchon's definition of "fairly secure." Point of error six is overruled.

In point of error seven, appellant asserts that the state's line of questioning regarding the EAC report was unfairly prejudicial under Rule 403. In point of error eight, he contends that such questioning denied him the individualized sentencing determination guaranteed by the Eighth Amendment. Appellant's arguments have no merit. The trial court did not permit the state to question Aubuchon regarding specific incidents of conduct by other inmates, nor did it allow the state to suggest that appellant was responsible for any of the incidents reflected in the EAC report. *Cf. Ex parte Lane*, 303 S.W.3d 702, 712 (Tex. Crim. App. 2009) (criticizing the prosecution for attempting to persuade the jury to convict the applicant based on an uncharged offense for which he was not on trial). Rather, the court limited the state to questioning Aubuchon about raw data concerning broad categories of offenses committed inside TDCJ and the frequency with which they occurred, in response to Aubuchon's assertion that TDCJ was a fairly secure or safe place. This was neither unfairly prejudicial under Rule 403 nor a denial of an individualized sentencing determination as guaranteed by the Eighth Amendment. Points of error seven and eight are overruled.

## Denial of Mistrial

In point of error nine, appellant argues that the trial court reversibly erred at the punishment phase when it denied his motion for a mistrial. Appellant asserts that a mistrial was warranted because the state "fabricated a death threat by misstating the evidence during [its] closing" argument.

The mistrial motion arose from the final sentence of the following portion of the prosecution's argument:

> Ladies and gentlemen, on February 3rd, 2010, [appellant] walked out of Ms. Boyd's office and drove to Bass Pro Shop. His [therapy] appointment ended at 1:45. And at 1:40 p.m. [sic] on February 3rd, 2010—the receipt is there, look at it—at 2:40 p.m., he was standing at the register [of Bass Pro Shop] with this (indicating).[23] And not just this, but a box of hollow-point ammunition. One hour after he walked out of Therapist Boyd's office.
>
> We don't know what happened that night. We know the kids were there visiting. Did he sit around and think about what he was going to do? Because if you don't know by now that it was in his mind to do [it] the day before, I don't know what else we can show or tell you. Everything tells you that he did this and he knew he was going to do it. And if you don't know just from these facts, you can look at his character and his past and know.
>
> He took this gun and he went home. And the next day, after enjoying, I guess, an evening with his sons, he took them home to their mother. And on the way, he stopped at Chili's. And at Chili's, he told Piero: If something happens to your mother and I—if your mother ends up dead in other words, and I go to prison—

Defense counsel interjected: "Objection. Improper argument, Judge. Not supported by the facts." The trial judge sustained the objection, telling the prosecutor to "[s]tay in the record." Defense counsel moved the trial court to instruct the jury to disregard. The trial judge granted the request, directing the jury to "disregard the last statement of the prosecutor." Defense counsel then moved for a mistrial, but the trial court denied the motion. The prosecutor continued, without objection from defense counsel:

> Well, let me quote it. [Appellant] said: If something happens to your mother and I, to his 10-year-old son, you are to go live with your Aunt Carina. And he said that less than two hours from when he stood on [Melissa's] doorstep and killed her.

---

[23] The record shows that appellant bought the pistol linked to the shootings, which was entered into evidence, at Bass Pro Shop. Based on that and the prosecutor's subsequent reference to "this gun," we presume that the prosecutor was indicating that pistol during this portion of her argument.

I'm sorry, ladies and gentlemen, but what do you think that is? What do you think that is?

Appellant contends that the statement at issue was solely an "[explanation] to one's child that he would be cared for if anything happened to his parents." He asserts that the state attempted to turn the statement into a "death threat" against Melissa, when that argument did not represent a reasonable inference from the evidence. Therefore, appellant contends, the prosecutor's argument was improper. Appellant further alleges that the trial court's instruction for the jury to disregard the statement was inadequate to cure the damage to his substantial rights, and thus, a mistrial was in order.

We have repeatedly stated that, even when the prosecution mentions facts outside the record during argument, an instruction to disregard will generally cure the error. *See, e.g.*, *Freeman v. State*, 340 S.W.3d 717, 727–28 (Tex. Crim. App. 2011); *Gamboa v. State*, 296 S.W.3d 574, 580 n.12 (Tex. Crim. App. 2009). Here, Piero Cole's actual testimony was that, shortly before the shootings, appellant said to him: "If me [sic] or your mom dies, you would go live with your Aunt Corina." The prosecutor's argument—which interpreted appellant's words in the context of evidence suggesting that his actions were premeditated—represented a reasonable inference from the evidence. But even assuming that the state's argument was improper, it was "not so extreme as to render ineffective an instruction to disregard." *Martinez v. State*, 17 S.W.3d 677, 691 (Tex. Crim. App. 2000). Point of error nine is overruled.

### Constitutionality of Article 37.071, Section 2(b)(1)

In points of error eleven and twelve, appellant argues that Article 37.071, § 2(b)(1), is unconstitutional on its face and as applied to him because the future-dangerousness special issue

lowers the state's burden of proof to a probability. Specifically, appellant alleges that Article 37.071, § 2(b)(1), violates the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 3, 10, 13, and 19 of the Texas Constitution. As appellant acknowledges, we have repeatedly overruled such challenges to Article 37.071, § 2(b)(1). *See, e.g., Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003); *Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994). Appellant does not persuade us to revisit these issues. Points of error eleven and twelve are overruled.

### Limitation of Appellant's Closing Argument

In point of error thirteen, appellant alleges that the trial court impermissibly "limited [his] presentation of mitigating evidence during closing argument" when it sustained the state's objections to certain aspects of his punishment-phase argument. Appellant contends that the trial court violated the Eighth Amendment because it "limited the mitigation evidence appellant was able to present and limited the evidence the jury believed [it] could consider."

Appellant's argument has no merit. The parties did not embark on closing argument until the evidentiary portion of the punishment trial was complete. There was no evidence to introduce or "present" during closing argument. *See Johnson*, 286 S.W.3d at 353 n.13 (counsel's arguments to the fact finder are not evidence). The trial court's rulings at issue could not have limited appellant's presentation of mitigating evidence, which was already complete before closing argument even began.

Further, the jury charge clearly instructed the jury that it must consider "all the evidence" submitted to it during the entire trial in answering the special issues. We presume that juries follow the trial court's instructions. *See Casanova v. State*, 383 S.W.3d 530, 543 (Tex. Crim. App. 2012)

(usual presumption on appeal is that jurors follow trial court's explicit instructions to the letter). Appellant contends that, by sustaining the state's objections and instructing the jury to disregard defense counsel's arguments, the trial court somehow caused the jury to believe that it could not consider certain evidence for purposes of answering the mitigation special issue. But his argument is speculative and inadequate to overcome the presumption that the jury followed the trial court's express instructions to consider all of the evidence in answering the special issues. *See id.* Point of error thirteen is overruled.

In point of error fourteen, appellant alleges that, by sustaining the state's objections to his closing argument, the trial court denied him his right to counsel. "Although we have held that improper denial of a jury argument may constitute a denial of the right to counsel, this holding assumes that the jury argument is one the defendant is entitled to make." *Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010); *see McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989). Proper jury argument generally falls within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to the argument of opposing counsel; or (4) plea for law enforcement. *Freeman*, 340 S.W.3d at 727.

The first sustained objection of which appellant complains arose when defense counsel noted the emotion that appellant's biological mother, Sonya, and younger sister, Corina, showed when they testified. Earlier in his closing argument, defense counsel had discussed the circumstances of appellant's adoption by the Coles. Counsel had emphasized Sonya's reluctance to part with her son and the emotional pain that appellant and his biological family had experienced as a result of the separation. After discussing other topics, defense counsel returned to the subject of appellant's adoption, reemphasizing the emotional pain it caused and commenting on the love that appellant's

biological family had for him:

> You could see when [Corina] and her mother, Sonya, testified [about] the impact that that whole situation back from 1978 [when the Coles adopted appellant] had upon the family. You know—because I saw y'all see it—that finally you *saw some emotion in [appellant] when his sister showed her emotion about him.*

(Emphasis added). The state objected after defense counsel uttered the italicized portion of the statement, on the grounds that the statement was outside the record. At the state's request, after sustaining the objection, the trial court instructed the jury to "disregard the last statement." On appeal, appellant contends that defense counsel was arguing that appellant felt remorse for killing the two victims and that remorse for the crime is relevant to the mitigation special issue. He asserts that, by sustaining the objection, the trial court thwarted defense counsel's attempt to draw the jury's attention to mitigating evidence and thus denied appellant his right to counsel.

We perceive no error in the trial court's decision to sustain the state's objection. Initially, the record does not support appellant's assertion concerning the purpose of defense counsel's argument—that it was an attempt to persuade the jury that appellant felt remorse for killing the two victims. It is clear from the preceding sentence—"You could see when [Corina] and her mother, Sonya, testified [about] the impact that that whole situation back from 1978 had upon the family"—that counsel was returning to the subject of appellant's adoption, in a renewed attempt to emphasize the emotional pain that the separation caused appellant and his biological family. It was not an attempt by defense counsel to argue that appellant had shown remorse for the killings. The trial court could not have deprived defense counsel of an argument that counsel was not attempting to make.

Moreover, defense counsel's statement during closing argument was neither a plea for law

enforcement nor was it an answer to the state's argument. Further, defense counsel's statement cannot reasonably be deemed a summary of the evidence or a reasonable deduction from the evidence because "[t]his sort of argument constitutes no evidence at all." *Cf. Good v. State*, 723 S.W.2d 734, 736 (Tex. Crim. App. 1986). Appellant's demeanor during his sister's testimony was not evidence subject to reference or allusion by defense counsel. In *Good*, over objection, the trial court permitted the prosecutor to argue to the jury that the defendant's orderly demeanor during the complainant's testimony was probative, *inter alia*, of the defendant's lack of remorse for the offense. *Id*. at 735. In reversing the conviction, we explained that the defendant's nontestimonial demeanor "was not evidence subject to reference by the prosecutor" because "[i]t was not offered into evidence through any legally recognizable method of proof. Allowing the state to summarize [the defendant's] non-testimonial demeanor impermissibly placed [the defendant's] demeanor before the jury through the prosecutor's unsworn jury argument. This sort of argument constitutes no evidence at all." *Id.* at 736 (internal citation omitted).

We see no reason that this conclusion should not apply equally when the defense attempts to argue that a defendant's demeanor during the testimony of another witness is probative of the defendant's remorse for the offense—especially where, as here, the defendant does not elect to testify. A contrary rule would allow defendants, through their counsel's jury argument of their counsel, to use the right to silence as both a shield and a sword, which we do not permit. *See United States v. Hastings*, 461 U.S. 499, 515 (1983) (Stevens, J., concurring) (protective shield of the Fifth Amendment should not be converted into a sword); *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1087 (5th Cir. 1979) ("The plaintiff who retreats under the cloak of the Fifth Amendment cannot hope to gain an unequal advantage against the party he has chosen to sue. To hold otherwise

would, in terms of the customary metaphor, enable plaintiff to use his Fifth Amendment shield as a sword. This he cannot do."); *Texas Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760–61 (Tex. 1995) (regarding the Fifth Amendment privilege, plaintiff cannot eat his cake and have it, too).

After the trial court sustained the state's objection to defense counsel's statement about appellant's demeanor during Corina's testimony, counsel returned to the subject of the testimony given by Sonya. Counsel argued that Sonya's testimony showed how important appellant was to his Ecuadoran family. Counsel then acknowledged that, despite how deeply appellant may have affected his Ecuadoran family, his actions on the day of the offense had also deeply affected "a lot of people." Counsel asserted, "Nobody here is minimizing that, but I ask you to ask yourselves this question: What impact does the death penalty have upon [appellant's] boys?" The state objected to the question posed by defense counsel on the grounds that it constituted an improper argument. The trial court sustained the objection.

Relying on *Ayers v. Belmontes*, 549 U.S. 7, 10 (2006), appellant argues that defense counsel's question attempted to draw the jury's attention to "forward-looking mitigation evidence," i.e., appellant's "potential to continue to be a positive influence in [his sons'] lives." We reject this contention. Defense counsel's question expressly asked the jury to focus on the impact appellant's execution would have on his sons, rather than evidence that appellant was committed to being a good father to his sons in the future.[24] The trial court's decision to disallow such argument was within the zone of reasonable disagreement. *Cf. Williams v. State*, 270 S.W.3d 112, 139 (Tex. Crim. App.

---

[24] Further, we note that appellant does not direct us to any testimony in the record regarding appellant's intention to be a good father to his sons in the future, nor does our review reveal any.

2008) (trial court does not abuse its discretion by excluding execution-impact testimony).

Appellant next complains that the trial court improperly sustained the state's objection at the end of the following portion of defense counsel's closing argument:

> I don't think I ever mentioned that when [appellant] left the scene in that truck he had OnStar. And don't you know that he knew he had OnStar? And don't you know that he knew he would be found and caught? And he had his son with him. After the worst 15 to 30 seconds in his entire life, he turned around because little Lucas was saying: Daddy, Daddy, and he turned around and picked him up. And that can be mitigating. Okay? There was no Amber Alert, there was no kidnapping. *He just wanted to be with his son a few more minutes before he was caught. And I guarantee you he absolutely knew he was going to be caught. And now here he is.*

(Emphasis added.) The state objected on the grounds that "all of that" was "outside the record." Appellant argues that the italicized portion of the above-quoted passage nonetheless constituted a reasonable inference from the evidence. We are not persuaded that the trial court's ruling fell outside the zone of reasonable disagreement.

An attorney may make reasonable deductions from the evidence so long as the argument is supported by the evidence and offered in good faith. *Andujo v. State*, 755 S.W.2d 138,144 (Tex. Crim. App. 1988). Defense counsel's statement concerned appellant's internal thought processes, something to which only appellant would normally be privy unless he told someone else. But appellant did not testify at either phase of the trial to offer the jury an explanation for taking the toddler with him. To the extent appellant alluded to Lucas in the videotaped statements he gave to police, it was not an abuse of discretion for the trial court to conclude that defense counsel's inference was unreasonable. In the portion of his Wharton County statement that was admitted into evidence, appellant mentions Lucas once, near the end of the statement, asking for Lucas's present location. In his Harris County statement, appellant describes Lucas approaching him in the parking

lot immediately after the shooting and relates that he picked up the child and put him in the truck. Later, appellant states that, when he took the money from his employer, he was thinking that he wanted to find a place for Lucas, did not want anything to happen to the child, and wanted to leave Lucas with someone, but no one was around. From this evidence, it is not a reasonable deduction that appellant wished to keep the child with him for just a little while longer.

We next consider appellant's challenge to the trial court's ruling regarding the following defense argument:

> [I] want to tell you what a wonderful experience it's been to represent [appellant] because obviously [co-counsel] and I . . . have spent hours and hours with [appellant]. And I think that I have learned is [sic] I recognize what all the other people recognize in [appellant] in the time that they knew him.
> Now, maybe I have not known him for five years, maybe I didn't work with him on a daily basis, but I'm pretty darn familiar with him since [the] middle of February of 2010. And I see why grown men, coworkers—

The state objected that defense counsel's argument was outside the record. The trial court did not rule on the objection, instead stating only, "No personal opinion, [counsel]." Appellant contends that defense counsel has the same right as the prosecutor to argue his opinion if that opinion is based on the evidence. *See Felder v. State*, 848 S.W.2d 85, 95 (Tex. Crim. App. 1992) (prosecutor "may argue his opinions concerning issues in the case so long as the opinions are based on the evidence in the record and not as constituting unsworn testimony"). We perceive no abuse of discretion by the trial court in disallowing the argument. Defense counsel's objected-to argument was not based on evidence offered and admitted at trial. Rather, it was based upon counsel's personal interactions with the defendant and the conclusions defense counsel reached about appellant as a result of that contact.

Finally, appellant challenges the trial court's ruling regarding defense counsel's argument

that, "The death penalty should be the last drastic step, that you have to take somebody's life.  There should be nothing more that you could possibly do with somebody.  You have to give him the death penalty because there is nothing else we can do with this guy."  The state objected that counsel's argument misstated the law.  The trial court sustained the objection.  Contrary to appellant's assertion, counsel's statement did not accurately summarize the death-selection process under Texas law.  *See* Art. 37.071, § 2(b) & (e).  The trial court did not abuse its discretion by sustaining the state's objection.  Point of error fourteen is overruled.

### Constitutionality of Article 37.071, Section 2(f)(4)

In point of error fifteen, appellant argues that Article 37.071, section 2(f)(4), limits the jury's consideration of all mitigating evidence, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Sections 13 and 19 of Article I of the Texas Constitution.  In point of error sixteen, appellant contends that Section 2(f)(4) is unconstitutional under these same federal and state constitutional provisions because it requires the jury to find a nexus between the commission of the crime and any mitigating evidence.  Appellant acknowledges that we have previously rejected such facial challenges to Section 2(f)(4),[25] but invites us to revisit our precedent. We decline to do so.  Points of error fifteen and sixteen are overruled.

In point of error seventeen, appellant alleges that Section 2(f)(4) is unconstitutional as applied to him because of the constitutional infirmities alleged in points of error fifteen and sixteen. Appellant contends that the jury charge and the state's closing argument exacerbated these alleged constitutional deficiencies because they required the jury to restrict its consideration of any

---

[25] *See Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010); *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); *Perry v. State*, 158 S.W.3d 438, 449 (Tex. Crim. App. 2004).

mitigating evidence to that which reduced his moral blameworthiness for committing the capital murder.

Appellant's argument has no merit. The record shows that the trial court's jury charge included the definition of mitigating evidence required by Section 2(f)(4). As discussed above, we have previously rejected appellant's constitutional challenges to Section 2(f)(4). *Coble*, 330 S.W.3d at 296; *Roberts*, 220 S.W.3d at 534; *Perry*, 158 S.W.3d at 449. There was thus no constitutional infirmity for the state's argument to aggravate. Further, we have reviewed the portion of the state's closing argument of which appellant complains. We reject appellant's contention that the state attempted to limit the kind of evidence to which the jury could give mitigating effect. Rather, we think the state's argument was reasonably understood by the jury as an assertion that, whatever mitigating effect the jury chose to give to the evidence before it, the mitigating effect was simply not enough to warrant a sentence of life without parole. Point of error seventeen is overruled.

We affirm the judgment of the trial court.


Delivered: June 18, 2014
Do Not Publish